# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| THE ARBITRAGE FUND; WATER ISLAND MERGER ARBITRAGE INSTITUTIONAL COMMINGLED FUND, LP; MORNINGSTAR ALTERNATIVES FUND A SERIES OF MORNINGSTAR FUNDS TRUST; LITMAN GREGORY MASTERS ALTERNATIVE STRATEGIES FUND; COLUMBIA MULTI-MANAGER ALTERNATIVE STRATEGIES FUND; WATER ISLAND DIVERSIFIED EVENT-DRIVEN FUND; WATER ISLAND LEVARB FUND, LP AND WATER ISLAND LONG/SHORT FUND, on behalf of themselves and all others similarly situated, | **CIVIL ACTION NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
|           Plaintiffs,<br><br>   vs. | |
| PATTERN ENERGY GROUP INC.; ALAN R. BATKIN; EDMUND JOHN PHILIP BROWNE; RICHARD A. GOODMAN; DOUGLAS G. HALL; PATRICIA M. NEWSON; MONA K. SUTPHEN; MICHAEL GARLAND and PATTERN ENERGY GROUP 2 LP (d/b/a PATTERN DEVELOPMENT), | |
|           Defendants. | |

Plaintiffs The Arbitrage Fund; Water Island Merger Arbitrage Institutional Commingled Fund, LP; Morningstar Alternatives Fund a series of Morningstar Funds Trust; Litman Gregory Masters Alternative Strategies Fund; Columbia Multi-Manager Alternative Strategies Fund; Water Island Diversified Event-Driven Fund; Water Island LevArb Fund, LP and Water Island Long/Short Fund (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations pertaining to Plaintiffs, which are alleged upon personal knowledge.

Plaintiffs' information and belief is based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of press releases and other public statements issued by Pattern Energy Group Inc. ("Pattern Energy" or the "Company"), Pattern Energy's filings with the U.S. Securities and Exchange Commission ("SEC"), media and analyst reports about the Company and other public information regarding the Company.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action on behalf of themselves and other public shareholders of Pattern Energy, besides the Defendants (defined below) and their affiliates (the "Class").  This class action alleges violations by (i) Pattern Energy, (ii) Pattern Energy's Board of Directors (the "Board" or the "Individual Defendants"); and (iii) Pattern Energy Group 2 LP ("Pattern Development" and collectively, the "Defendants") of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, arising out of the Board's attempt to merge Pattern Energy with Canada Pension Plan Investment Board ("CPPIB"), cashing out all of the common stock of Pattern Energy and delisting Pattern Energy from the NASDAQ (the "Proposed Transaction").

2.     On February 4, 2020, Pattern Energy filed a Definitive Proxy with the SEC ("Proxy") that purported to describe the Agreement and Plan of Merger ("Merger Agreement"), dated as of November 3, 2019, pursuant to which CPPIB will acquire all of Pattern Energy's common stock for $26.75 per share (the "Merger Consideration").  The Proxy also purports to detail the sales process that resulted in the Merger Agreement, including a concurrent and related process to sell Pattern Energy's privately-owned sister company, Pattern Development.  The Merger Agreement resulted in CPPIB entering into an agreement pursuant to which Pattern

Energy and Pattern Development will be brought under common ownership (the "Pattern Development Transaction") at or following completion of the Proposed Transaction.

3.      Pattern Energy and Pattern Development are run and managed as one company. Pattern Development develops and constructs renewable energy projects.  Pattern Energy, which has a right of first offer on all projects Pattern Development looks to sell, then acquires and manages these renewable energy facilities.   In fact, Pattern Energy's website touts that "[a]lthough Pattern Energy [] and Pattern Development are legally separate with different ownership, [they] are aligned in leadership, mission, vision, and values."  The two companies' employees (including their management) work across both companies as one team. Additionally, Pattern Energy owns a 29% equity stake in Pattern Development.

4.      70% of the equity in Pattern Development is owned by Riverstone Holdings LLC and its affiliates ("Riverstone").   Pattern Energy represents in the Proxy that Pattern Development (and, therefore, Riverstone) has a contractual right to limit Pattern Energy's ability to merge with, or transfer its interest in Pattern Development to, any third party without Pattern Development's consent, thereby further entangling the two companies (the "Consent Agreement").  Riverstone, through Pattern Development, ostensibly, has a "veto" on any offer to purchase Pattern Energy.

5.      The Proxy purports to disclose the details of CPPIB's acquisition of the public company, Pattern Energy, without revealing the details of the sale of the related private company, Pattern Development.  As a result, Pattern Energy shareholders are only given half the story of the sale of these intertwined companies.  For example, the Proxy fails to inform Pattern Energy shareholders:

- Whether bidders were told that the sale of Pattern Energy was conditioned on the acquisition of Pattern Development;

- Whether the purported Consent Agreement had a chilling effect on bidders, especially those who already had development arms and had no need for Pattern Development;

- The financial terms of the Pattern Development Transaction;

- The financial terms of any bid for Pattern Development made concurrently with a bid for Pattern Energy;

- The details of the negotiations by Pattern Energy's management to retain their employment at Pattern Energy and Pattern Development; and

- The economic interest of Pattern Energy's management in Pattern Development, including any change-of-control payments and acceleration of equity awards and long-term incentive plans as a result of the Pattern Development Transaction.

6.      Without this information, Pattern Energy's shareholders are unable to assess whether the Merger Consideration constitutes fair value for their shares, to assess the value of Pattern Energy as a standalone company, or to determine how much more bidders would have paid for just Pattern Energy.   Some bidders, including CPPIB, appeared to approach the negotiations with Pattern Energy and Pattern Development as if they were a single company. But under the current Proxy, Pattern Energy shareholders cannot assess whether they are being offered an appropriate portion of the full merger consideration each bidder was willing to pay for Pattern Energy and Pattern Development combined.   Nor can they determine whether bidders were dissuaded by the combined sales process, resulting in lower merger consideration.

7.      The Proxy further omits the value placed on Pattern Energy's 29% equity stake in Pattern Development under the Proposed Transaction.   The Proposed Transaction and the Pattern Development Transaction must be viewed as one transaction.   Both transactions were negotiated during the same sales process, with the same bidder, and were signed and announced at the same time.   However, the Proposed Transaction will close prior to the Pattern Development Transaction, potentially depriving Pattern Energy shareholders of the value of their 29% equity

stake in Pattern Development.  This is because such shareholders will no longer hold Pattern Energy common stock, or their equity stake in Pattern Development, when the Proposed Transaction closes.  Accordingly, the Proxy must disclose sufficient information for shareholders to determine: (i) what, if any, portion of the Merger Consideration represents the value of Pattern Energy's equity stake in Pattern Development; and (ii) whether that equity stake is valued on the same basis as other Pattern Development equity holders under the Pattern Development Transaction (*i.e.* are Pattern Energy shareholders receiving the same merger premium as other Pattern Development equity holders).

8.      The Proxy also omits material details pertaining to interested parties to the Proposed Transaction and vital valuation metrics for the deal.  This includes the Proxy's incomplete and misleading information concerning the Company's financial projections prepared by Pattern Energy management, and the financial analysis conducted by Pattern Energy's financial advisor on the deal, Evercore Group L.L.C. ("Evercore").

9.      Accordingly, Plaintiffs allege herein that Defendants violated Sections 14(a) and 20(a) of the Exchange Act by filing a false and misleading Proxy.  In the event the Proposed Transaction is consummated without disclosure of the material information referenced herein, Plaintiffs seek to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9.  This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.      Personal jurisdiction exists over each Defendant either because (i) the Defendant conducts business in or maintains operations in this District or (ii) is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Venue is also proper in the District as Pattern Energy is incorporated in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.     Plaintiffs are, and have been at all relevant times, owners of shares of Pattern Energy stock eligible to vote on the Proposed Transaction, as set forth in the attached certification.

15.     Defendant Pattern Energy is a corporation organized and existing under the laws of the State of Delaware.  The Company's principal executive offices are located at 1088 Sansome Street, San Francisco, CA 94111.  Pattern Energy common stock trades on the NASDAQ Global Select exchange under the ticker symbol "PEGI."

16.     Defendant Alan R. Batkin ("Batkin") is the Chair of the Board and Chairperson of the Special Committee, defined below.  Batkin has been a director of Pattern Energy since October 2013.

17.     Defendant Edmund John Philip Browne ("Browne") is a director on the Board as of October 2013.  Riverstone appointed Defendant Browne to the Board in 2012.  Additionally, Defendant Browne was a partner at Riverstone for eight years.

18.     Defendant Richard A. Goodman ("Goodman") is a director on the Board as of December 30, 2018 and a member of the Special Committee as of February 22, 2019.

19.     Defendant Douglas G. Hall ("Hall") is a director on the Board and a member of the Special Committee as of February 22, 2019.

20.     Defendant Patricia M. Newson ("Newson") is a director on the Board as of January 2012 and a member of the Special Committee.

21.     Defendant Mona K. Sutphen ("Sutphen") is a director on the Board as of December 30, 2018.

22.     Defendant Michael Garland ("Garland") is the co-founder, Chief Executive Officer and a director of Pattern Energy since October 2012.

23.     Defendants Batkin, Browne, Goodman, Hall, Newson, Sutphen and Garland are collectively referred to herein as the "Board" or the "Individual Defendants."  Defendants Batkin, Hall, Goodman, Newson and Sutphen served on the Special Committee of the Board, along with Patricia S. Bellinger (until her resignation from the Board on December 28, 2018) (the "Special Committee").

24.     Defendant Pattern Energy Group 2 LP (d/b/a Pattern Development) is a limited partnership organized and existing under the laws of the State of Delaware.

## SUBSTANTIVE ALLEGATIONS

### A.     The Intertwined Relationship Between Pattern Energy, Pattern Development, and Riverstone

25.     Pattern Energy was incorporated in October 2012 and completed its initial public offering ("IPO") in October 2013, with simultaneous listings on NASDAQ and the Toronto Stock Exchange.  Pattern Energy is a U.S.-based, independent renewable power company that operates utility scale wind and solar facilities throughout the U.S., Canada and Japan.  It does so

by acquiring operating assets primarily from its sister company, Pattern Development and its predecessor Pattern Energy Group LP ("PEG").  Pattern Development is a privately-owned limited partnership that develops and constructs renewable energy projects.

26.     Pattern Energy and Pattern Development were formed and initially controlled by Riverstone.

27.     Riverstone is an energy and power-focused private investment firm which conducts buyout and growth capital investments in the exploration and production, midstream, oilfield services, power and renewable sectors of the energy industry

28.     At the time of Pattern Energy's IPO, certain affiliates of Riverstone held greater than 60% of the outstanding common stock interests in Pattern Energy, and, therefore, Riverstone was its controlling shareholder.



29.     Following the IPO Riverstone sold its shares in Pattern Energy but it's two appointed directors remained on Pattern Energy's Board, much of Pattern Energy's senior most management served in similar capacities in Riverstone-controlled Pattern Development, and

Riverstone controlled the exercise of Pattern Development's putative veto over any acquisition of Pattern Energy.

30.     Pattern Development is a Delaware limited partnership formed and still controlled by Riverstone.  Pattern Energy was formed from Pattern Development's predecessor, PEG, which was also controlled by Riverstone.

31.     Since its 2013 IPO, Pattern Energy has experienced rapid growth, much of it through acquisitions from PEG, and now its successor Pattern Development.  Pattern Energy has a right of first offer for projects developed by Pattern Development.  As indicated on Pattern Energy's website, "[a]lthough Pattern Energy [] and Pattern Development are legally separate with different ownership, [they] are aligned in leadership, mission, vision, and values."  The two companies' employees work across both companies as one team.

32.     Riverstone owns a 70% equity interest in Pattern Development and controls and manages the company.  The rest of Pattern Development's equity interest is owned by Pattern Energy (29%) and Pattern Energy's management (1%).

33.     Pattern Energy represented in the Proxy that "pursuant to a set of contractual arrangements, development companies formed and controlled by Riverstone, including Pattern Development, have been the primary source for Pattern [Energy] to acquire operational projects. These contractual arrangements with Pattern Development also limit Pattern [Energy]'s ability to merge with, or to transfer its interest in Pattern Development to, any third party without Pattern Development's consent" (*i.e.* the Consent Agreement).  However, as discussed more fully below, this representation is inconsistent with the disclosures in Pattern Energy's prior SEC filings, rendering the representations in the Proxy false and misleading.

34.     As of October 2018, Riverstone and its affiliates no longer held any shares of Pattern Energy's common stock.  However, Pattern Energy represented in the Proxy that through the purported Consent Agreement, Pattern Development (and effectively Riverstone) had veto power over any proposed merger involving Pattern Energy.



35.     Additionally, Pattern Energy and Pattern Development share personnel, even at the highest levels of the two companies.  The majority of the executive officers at Pattern Energy were dually employed by Pattern Development, as demonstrated in the chart below.

| Executive Officers at Pattern Energy | Position at Pattern Energy | Position at Pattern Development |
|---|---|---|
| Michael Garland | Chief Executive Officer and Board Director | Chief Executive Officer |
| Hunter Armistead | Executive Vice President of Business Development | President |
| Michael Lyon | President | Former Head of Structured Finance |
| Daniel Elkort | Executive Vice President and Chief Legal Officer | General Counsel |
| Esben Pedersen | Chief Financial Officer | Chief Financial Officer |
| Richard Ostberg | Senior Vice President and Chief Accounting Officer | N/A |
| Christopher Shugart | Senior Vice President of Corporate Operations | Senior Vice President of Corporate Operations |
| Kevin Devlin | Senior Vice President of Project Operations | N/A |
| Sarah Webster | Vice President of Government Relations | N/A |
| Deborah McAdam | Vice President of Human Resources | Vice President of Human Resources |
| Frank Davis | Country Head, Canada | N/A |
| Kim Liou | General Counsel | N/A |

36.     In addition, Riverstone, which controlled Pattern Development, exercised additional influence over Pattern Energy through its appointment of Defendant Edmund Browne

in 2013 and Michael Hoffman in 2012 to the Board of Pattern Energy.  Defendant Browne was a

partner at Riverstone for eight years and is still a Board member of Pattern Energy.

37.     Therefore, as demonstrated more fully below, the officers and directors had

conflicts of interest as their loyalty was split between Pattern Energy and Pattern Development.

And while the above information was referenced in the Proxy and Pattern Energy's other public

statements, the Proxy still fails to disclose whether Pattern Energy's executives acted to

maximize shareholder value in the merger negotiations.

**B.     The Proxy Fails to Disclose the Full Terms of the Bids For Pattern Energy**

38.     On June 5, 2018, the Board of Pattern Energy formed the Special Committee and

empowered it "to consider and negotiate a potential strategic transaction involving Pattern

[Energy] and, ultimately, to make a recommendation to our Board with regard to any such

transaction."  The Special Committee engaged Evercore as its financial advisor for the purposes

of conducting the strategic review.  The Special Committee did not publicly state a preference

for a transaction for Pattern Energy alone or a joint transaction that included Pattern

Development.  However, Party A, the only known entity that tried to acquire just Pattern Energy,

was ultimately unsuccessful in reaching an agreement with Pattern Development to obtain their

consent for Party A's proposed transaction.  This was true despite Party A's willingness to

provide higher merger consideration.

39.     The Proxy disclosed that on July 23, 2019, Pattern Energy received a bid from

Party A, offering to combine Company A, Pattern Energy, *and* Pattern Development in an all-

stock transaction at an exchange ratio reflecting an implied 15% premium to the trading price of

Pattern Energy's common stock.  Alternatively, Party A offered to combine Company A and

Pattern Energy, *without also acquiring Pattern Development,* in an all-stock transaction at an

exchange ratio reflecting an implied 20% premium to the trading price of Pattern Energy's common stock.

40.     Therefore, Party A was willing to pay Pattern Energy's public shareholders an additional 5% premium to buy the company in which they had invested (Pattern Energy), without also buying a separate privately-owned company (Pattern Development).

41.     The Proxy states that at an August 1, 2019 meeting, the Special Committee of Pattern Energy's Board discussed Party A's July 23 proposal and compared it to Pattern Energy's projected performance as a standalone company. The Proxy fails to explain why the Special Committee engaged in this analysis since its shareholders were already valuing Pattern Energy as a standalone company. According to the Proxy, between August 1-12, representatives of the Special Committee contacted Party A, as well as other bidders, to encourage them to improve their previous proposals. But the Proxy fails to disclose whether the Special Committee indicated to bidders that Pattern Energy had a preference for either a standalone sale or a combined sale with Pattern Development. In fact, other than Party A's bid, the Proxy fails to disclose any of the bid parameters related to the sale of Pattern Development.

42.     Moreover, aside from its reference to Party A's July 23 bid, the Proxy is entirely silent on the financial terms of any potential offer made by other bidders to acquire Pattern Development together with Pattern Energy – *including CPPIB's final successful bid memorialized in the Merger Agreement*. It is crucial for Pattern Energy shareholders to understand the full terms of any bid in order to assess whether such bid correctly values the public company in which they own an equity stake. However, the Proxy fails to disclose whether certain of the alternate bids were for Pattern Energy alone or for Pattern Energy and Pattern Development combined.

43.     For example, as set forth below, the Proxy fails to disclose the full terms of certain offers to buy Pattern Energy.  Indeed, none of these bid descriptions indicate the price at which the bidders were willing to acquire Pattern Development as part of a transaction, if at all:

- "On June 28, 2019, representatives of CPPIB sent a non-binding proposal to members of our Board in which it offered to purchase the outstanding shares of Company Common Stock for $25.50 per share in cash, subject to completion of due diligence.  CPPIB noted that the proposal was subject to an agreement being reached with respect to the acquisition of Pattern Development, but did not expressly indicate whether the acquisitions of Pattern [Energy] and Pattern Development would be cross-conditioned";

- "On July 8, 2019, Party D submitted a non-binding written proposal to Mr. Batkin that included a non-binding offer to acquire the outstanding shares of Company Common Stock for $25.00 per share in cash.  Party D's proposal was conditioned on Party D's completion of a due diligence review of the business and operations of each of Pattern [Energy] and Pattern Development but did not expressly indicate whether the acquisitions of Pattern [Energy] and Pattern Development would be cross-conditioned";

- "On July 16, 2019, representatives of Party D sent representatives of the Special Committee, Pattern [Energy] management and Riverstone Representatives a proposal in which Party D offered to acquire the outstanding shares of Company Common Stock for $25.00 per share in cash. Party D's proposal was conditioned on Party D's completion of a due diligence review of the business and operations of each of Pattern [Energy] and Pattern Development but did not expressly indicate whether the acquisitions of Pattern [Energy] and Pattern Development would be cross-conditioned";

- "Later on August 16, 2019, representatives of the Special Committee received a revised non-binding letter proposal from CPPIB that included an offer to acquire the outstanding shares of Company Common Stock for between $26.25 and $26.50 in cash per share and to purchase the equity interests in Pattern Development not owned by Pattern [Energy] from Riverstone, subject to completion of due diligence. The proposal did not expressly indicate whether the acquisitions of Pattern [Energy] and Pattern Development would be cross-conditioned";

- "On August 27, 2019, Pattern [Energy] received a non-binding letter of interest from Party B indicating an interest in acquiring the outstanding shares of Company Common Stock for between $25.00 and $28.00 per share in cash, subject to confirmatory due diligence";

- "On August 29, 2019 . . . Representatives of Party D indicated that it would be willing to offer up to $26.50 in cash per share of Company Common Stock, subject to approval by its investment committee";

- "On September 20, 2019, representatives of Party D sent Mr. Batkin, Mr. Garland and Riverstone Representatives a non-binding proposal in which Party D offered to acquire the outstanding shares of Company Common Stock at a price of $26.75 per share in cash. Party D's non-binding proposal contemplated that Party D would acquire Pattern [Energy] and Pattern Development, but did not expressly indicate whether the acquisitions of Pattern [Energy] and Pattern Development would be cross-conditioned. Party D requested a 30-day period of exclusivity to negotiate definitive documentation"; and

- "On October 28, 2019, representatives of CPPIB submitted an offer to purchase the outstanding shares of Company Common Stock for $26.75 in cash per share."

44.     None of these disclosures give Pattern Energy shareholders a sufficient picture of the potential (and actual) acquirers' valuation of Pattern Energy in a sale that is not conditioned on the purchase of Pattern Development. Without knowing the full terms of each of the bids, Pattern Energy shareholders cannot assess whether they are being offered an appropriate portion of the full merger consideration each bidder was willing to provide for the two companies on a combined basis. For example, while Party A's July 23 bid indicates that Pattern Energy is worth significantly more than Pattern Development, shareholders are left uncertain as to whether the private company is receiving a higher percentage of the merger consideration in each offer. Additionally, as discussed further below, Riverstone and Pattern Development's purported ability to withhold their consent on any transaction via the Consent Agreement had a chilling effect on the sales process, further leaving shareholders without insight into the value of Pattern Energy as a standalone company.

45.     The omission of Pattern Development's bid price is also material because the sale of Pattern Energy was apparently conditioned on the sale of Pattern Development. Pattern Energy owns 29% of Pattern Development and Pattern Energy shareholders are entitled to

receive the same value for that asset as Riverstone and the management investors in Pattern Development.

46.     Specifically, the Proxy omits the value placed on Pattern Energy's 29% equity stake in Pattern Development under the Proposed Transaction.  The Proposed Transaction and the Pattern Development Transaction must be viewed as one transaction.  Both transactions were negotiated during the same sales process, with the same bidder, and were signed and announced at the same time.   However, the Proposed Transaction will close prior to the Pattern Development Transaction, potentially depriving Pattern Energy shareholders of the value of their 29% equity stake in Pattern Development.  This is because such shareholders will no longer hold Pattern Energy common stock, or their equity stake in Pattern Development, when the Proposed Transaction closes.

47.     Pattern Energy must therefore disclose to its shareholders: (i) what, if any, portion of the Merger Consideration represents the value of Pattern Energy's equity stake in Pattern Development; and (ii) whether that equity stake is valued on the same basis as other Pattern Development equity holders under the Pattern Development Transaction (*i.e.* are Pattern Energy shareholders receiving the same merger premium as other Pattern Development equity holders). Without this critical information, Pattern Energy's shareholders are unable to assess the value of the Merger Consideration being offered to them, and cannot cast an informed vote on the Proposed Transaction.

**C.     The Proxy Fails to Disclose Whether Bidders Were Told That the Sale of Pattern Energy Was Conditioned on the Acquisition of Pattern Development**

48.     As discussed above, Pattern Energy represented in the Proxy that "pursuant to a set of contractual arrangements, development companies formed and controlled by Riverstone, including Pattern Development, have been the primary source for Pattern [Energy] to acquire

operational projects. These contractual arrangements with Pattern Development also limit Pattern [Energy]'s ability to merge with, or to transfer its interest in Pattern Development to, any third party without Pattern Development's consent."

49.     This statement is inconsistent with the disclosures in Pattern Energy's 2018 Form 10-K filed with the SEC. In 2014, Pattern Energy entered into an agreement with Pattern Development's predecessor (PEG) that gave the predecessor a veto right over any potential Pattern Energy merger. That veto right became null and void later in 2014. Pattern Energy disclosed the termination of this veto provision in its 2014 Form 10-K filed with the SEC. However, the 2014 10-K indicated that Pattern Development's predecessor (PEG) had the ability, *but not the right*, to influence Pattern Energy's ability to merger with other parties. Pattern Energy repeated this disclosure in its 2015, 2016 and 2017 Forms 10-K.

50.     Notably, in its 2018 Form 10-K, Pattern Energy **removed** the language indicating that Pattern Development's predecessor had the ability, but not the right, to influence Pattern Energy's ability to merger with other parties. Plaintiffs understood that the removal of this language indicated Pattern Development and Pattern Development's predecessor had no right to veto or even influence a potential Pattern Energy merger.

51.     Defendants' statement in the Proxy that "pursuant to a set of contractual relationships" Pattern Development had the absolute right to limit Pattern Energy's ability to merge with any third party without Pattern Development's consent is wholly at odds with their statements in public filings beginning as early as 2014, rendering the Proxy false and misleading on a critical issue. Pattern Energy shareholders are entitled to a full disclosure of which specific "contractual relationships" purportedly gives Pattern Development this consent right and why the statements in the Proxy contradict earlier SEC filings.

52.     The Proxy is also silent on what potential bidders were told about this putative Consent Agreement, including the 11 parties (*i.e.*, Parties A-J and CPPIB) who expressed an interest in acquiring Pattern Energy before execution of the Merger Agreement, and the 16 potential bidders who were contacted in the post-signing "go-shop" period.

53.     In addition, the Proxy omits details about the bid process as it related to Pattern Development, including whether these bidders were told that Pattern Energy likely could not be acquired without the concurrent acquisition of Pattern Development.   This issue takes on additional significance when one considers that at least some of the potential strategic bidders already owned energy development companies and did not need to acquire Pattern Development. Therefore, the forced inclusion of Pattern Development in any potential Pattern Energy deal may have had a chilling effect on strategic buyers, or caused them to lower their respective offers.

54.     Moreover, Pattern Energy shareholders are entitled to know whether Pattern Development and Riverstone actually or effectively blocked higher bids for Pattern Energy pursuant to the Consent Agreement, thereby lowering the Merger Consideration received by Pattern Energy shareholders under the Proposed Transaction.

**D.     The Proxy Fails to Disclose Pattern Energy Management's Potential Employment-Related Conflicts of Interest**

55.     The Proxy fails to disclose any negotiations or communications regarding the future employment of Pattern Energy's management post-merger.   It also omits the details of any employment-related discussions and negotiations that occurred between CPPIB and Pattern Energy executives, including who participated in such communications, when they occurred, and what was discussed.   The Proxy further fails to disclose whether any of CPPIB's proposals or indications of interest addressed the prospect of management retention post-merger.

56.     Naturally, the Pattern Energy management team would prefer, and therefore prioritize, a transaction with a buyer who would continue to employ them over any transaction with a buyer who would not.  Additionally, most members of the Pattern Energy management team were dually employed by Pattern Energy and Pattern Development and had an incentive to prefer a buyer who would acquire both companies and continue their joint employment.

57.     Any communications or information regarding post-transaction employment during the negotiation of the Proposed Transaction must be disclosed to Pattern Energy shareholders.  This information is necessary for shareholders to understand potential conflicts of interest by Pattern Energy management and the Board, which may have prevented them from acting in the best interests of such shareholders.  The omitted information, if properly disclosed, would significantly alter the total mix of information available to Pattern Energy shareholders.

58.     Moreover, Pattern Energy's management collectively owned a 1% equity stake in Pattern Development.  The management team had an incentive to prioritize buyers who would skew the transaction to more favorable terms for the equity holders in Pattern Development than the shareholders of Pattern Energy.

59.     Additionally, as demonstrated in paragraph 35, *supra*, the vast majority of Pattern's officers and directors hold additional positions at Pattern Development.  The Proxy excludes fulsome descriptions of all compensation or other benefits to be received by these individuals based on their positions at Pattern Development, including any change-of-control payments and acceleration of equity awards and long-term incentive plans as a result of the Pattern Development Transaction.  Accordingly, the Proxy fails to disclose the full terms of compensation to be paid to Pattern's officers and directors if the Proposed Transaction is consummated.  Therefore, it is impossible for Pattern shareholders to assess the extent to which

Pattern's officers and directors were conflicted while negotiating, approving, and recommending the Proposed Transaction.  It is vital that shareholders have access to this information before voting on the Proposed Transaction.

      **E.**    **The Proxy Fails To Disclose That PSP Is An Interested Party To The Proposed Transaction**

60.    The Proxy fails to disclose that Public Sector Pension Investment Board ("PSP"), is an interested and/or related party to the Proposed Transaction and Pattern Development Transaction and should be excluded from the shareholder vote.

61.    PSP is a direct co-investor with Pattern Energy on substantial renewable energy projects undertaken by the Company.  This includes PSP's $500 million project funding commitment to Pattern Energy in 2017.  PSP has dedicated this money to joint energy projects with Pattern Energy, such as the joint acquisition of the Meikle Wind Power Facility and the Mont Sainte-Marguerite Wind Power Facility.  Their co-investments also include PSP's purchase of an interest in the Panhandle 2 project from Pattern Energy.  PSP owns 49% of each of these projects together with Pattern Energy, which owns the remaining 51%.  PSP's co-investments in these projects were made at the same purchase price and on the same terms as Pattern Energy.

62.    PSP has also agreed to cooperate with Pattern Energy on future third-party acquisitions, and to support Pattern Energy's funding through potential bridge financing for projects under construction.  In addition, PSP has an indirect investment interest in Pattern Development.  The Proxy materially omits that PSP has a significant interest in the Proposed Transaction given its substantial co-ownership of energy projects with Pattern Energy, its enormous funding commitments to Pattern Energy, and its investment interest in Pattern Development.

63.     PSP is also Pattern Energy's largest shareholder, and acquired its entire equity stake from Riverstone.  PSP currently holds 9.5% of Pattern Energy's outstanding common stock.  PSP and another substantial Pattern Energy shareholder, CBRE Caledon Capital Management Inc. ("CBRE"), collectively control over 18% of the Pattern Energy shareholders voting on the Proposed Transaction.  As set forth in the Proxy, CBRE has agreed to vote all of its shares in favor of the Proposed Transaction.  But the Proxy materially omits that PSP's substantial co-investments with Pattern Energy makes it an interested party, which effectively ensures its affirmative vote for the Proposed Transaction as well.

64.     Thus, the Proxy fails to disclose that Pattern Energy has already locked up a substantial block of shareholders in support of the Proposed Transaction (*i.e.*, PSP and CBRE).  By doing so, the Proxy also misrepresents the number of disinterested shareholders necessary to approve the deal.

65.     The Proxy states that under the Delaware General Corporation Law ("DGCL"), adoption of the Merger Agreement between Pattern Energy and CPPIB "requires the affirmative vote of the holders of a majority of the shares of [Pattern Energy] Common Stock and [Pattern Energy] Preferred Stock voting together as a single class."

66.     Because Pattern Energy is a reporting issuer under applicable Canadian securities laws, it is subject to the provisions of Multilateral Instrument 61-101 (Protection of Minority Security Holders in Special Transactions) ("MI 61-101").  MI 61-101 is intended to ensure equal treatment among securityholders in connection with business combinations such as the Proposed Transaction.  It does so by, among other things, requiring approval of such transactions by a majority of securityholders, excluding interested or related parties.

67.     In addressing the requirements of MI 61-101, the Proxy states that the Proposed Transaction is "required to be approved by a majority of votes cast by holders of [Pattern Energy] Common Stock, other than those holders required to be excluded from such vote pursuant to Part 8 of MI 61-101 [Minority Approval]."   The Proxy further refers to this requirement as the "majority of the minority vote" required for approval under MI 61-101.

68.     According to the Proxy, as of the January 31, 2020 record date for Pattern Energy shareholders entitled to vote on the Proposed Transaction, an aggregate of 1,210,049 votes attached to Pattern Energy common stock are required to be excluded from the shareholder vote pursuant to MI 61-101.

69.     Under a section entitled "***Excluded Votes***," the Proxy limits these interested or related party shares to Pattern Energy's senior officers only:

| Name | Shares of Company Common Stock | Percent of Total Outstanding Company Common Stock |
|---|---|---|
| Hunter Armistead | 204,171 | 0.21% |
| Dyann Blaine | 14,647 | 0.01% |
| Julie Brand | 4,987 | 0.01% |
| Kevin Devlin | 28,692 | 0.03% |
| Daniel Elkort | 90,310 | 0.09% |
| Michael Garland | 388,477 | 0.40% |
| Kim Liou | 9,643 | 0.01% |
| Michael Lyon | 185,727 | 0.19% |
| John Martinez | 10,654 | 0.01% |
| Richard Ostberg | 31,378 | 0.03% |
| Esben Pedersen | 155,412 | 0.16% |
| Christopher Shugart | 70,834 | 0.07% |
| Sarah Webster | 15,117 | 0.02% |

70.     PSP is notably absent from the Proxy's list of Pattern Energy's common shareholders to be excluded from the shareholder vote as an interested party.   Accordingly, the Proxy fails to fully inform Pattern Energy shareholders of the number of disinterested shareholders necessary to approve the Proposed Transaction.

71.     The Proxy should be amended to exclude the PSP's shares from the "majority of the minority vote" needed to approve the deal.   At a minimum, the Proxy should include further detail on PSP's substantial co-investments with Pattern Energy, and its funding commitments with the Company in order to inform shareholders of PSP's interest in the Proposed Transaction.

**F.      The Proxy Fails to Disclose Vital Valuation Metrics for the Proposed Transaction**

**1.      The Proxy Fails to Disclose Material Portions of the Financial Projections Relied Upon by the Board and Its Financial Advisors**

72.     The Proxy states that Pattern Energy's financial advisor, Evercore, "reviewed certain non-public internal projected financial statements and other non-public financial and operating data relating to Pattern [Energy]" (the "Projections") in preparing its fairness opinion on the Proposed Transaction.

73.     The Proxy states that Projections for Pattern Energy as a standalone company were created for the years 2019 through 2027, but only discloses Projections for 2019 through 2023.  The omission of half of the Projections, including the key final years that contribute to the terminal year Projections, materially misleads Pattern Energy's stockholders about both the Company's future cash flows and Evercore's financial analysis.

74.     Additionally, the Proxy omits Pattern Energy's, levered, after-tax free cash flows. Instead, the Proxy discloses a non-analogous figure, "After-Tax Equity Cash Flow."  Further, the Proxy fails to provide: (i) all line items used to calculate Adjusted EBITDA and Corporate EBITDA, and (ii) a reconciliation of all non-GAAP to GAAP metrics.

75.     The above-referenced omitted information relating to Pattern Energy's financial projections significantly alters the total mix of information available to Pattern Energy's shareholders regarding the future value of the Company.   The omission of this projected

financial information prevents Pattern Energy shareholders from performing their own valuation of the Company.

**2.      The Proxy Fails to Disclose Material Portions of the Inputs into Evercore's Fairness Opinion**

76.     The description in the Proxy of the financial analysis performed by Evercore omits key inputs and assumptions underlying it. Without this information, as described below, Pattern Energy's shareholders are unable to fully understand Evercore's analysis and, thus, cannot determine what weight, if any, to place on Evercore's fairness opinion in deciding how to vote on the Proposed Transaction.

77.     With respect to Evercore's Discounted Cash Flow Analysis, the Proxy fails to disclose (i) the Company's standalone, levered, after-tax free cash flows and the inputs used to calculate them; (ii) inputs from the management forecasts after the year 2023; (iii) the terminal values for Pattern Energy; (iv) Evercore's assumptions behind applying a perpetuity growth rate of (1.00)% to 1.00%; and (v) Evercore's inputs and assumptions used to apply a discount rate of 7.5% to 9.5% for Pattern Energy (excluding Pattern Development), and 12.5% to 17.5% for its subsidiary.

78.     With respect to Evercore's Selected Public Company Trading Analysis, the Proxy omits: (i) the individual cash available for distribution ("CAFD"), dividend and 2020 EBITDA multiples observed for each company and (ii) Evercore's basis to applying a dividend yield of 7.25% to 6.25%, CAFD multiple of 11.4x to 13.5x, and a 2020 EBITDA multiple of 10.5x to 12.0x.

79.     With respect to Evercore's Selected Transaction Analysis, the Proxy omits (i) the individual multiples for each of the observed transactions; (ii) the Company's estimated net debt;

(iii) the value of the Company's ownership in Pattern Development; and (iv) the number of fully diluted shares of Pattern Energy's common stock as of November 1, 2019.

80.     With respect to Evercore's analysis of equity research analysts' price targets for Pattern Energy common stock, the Proxy fails to disclose the following: (i) the individual price targets for Pattern Energy observed by Evercore in its analysis; and (ii) the sources of those price targets.

81.     Without this information, Pattern Energy's shareholders are unable to fully understand Evercore's fairness opinion and analysis, and thus cannot determine how much weight, if any, to afford it when voting on the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Pattern Energy shareholders.

### 3.     The Proxy Fails to Disclose Updated Financial Information Despite Changed Market Conditions

82.     The Proxy touts that if the Proposed Transaction is completed, "each share of [Pattern Energy] Class A common stock will be converted into the right to receive $26.75 in cash, . . . which represents a premium of approximately 14.8% relative to the unaffected closing price for shares of our Class A common stock on the Nasdaq on August 9, 2019 (the last trading day prior to the publication of market rumors regarding a potential acquisition of the Company) and a premium of approximately 15.1% over the 30-day volume weighted average price on the Nasdaq prior to that date."  This statement, which is repeated at least twice in the Proxy, serves to mislead Pattern Energy shareholders into believing that the Merger Consideration is fair.

83.     As Defendants knew when they filed the Proxy on February 4, 2020, there has been a seismic shift in the valuation of renewable energy companies due to a surge in environmental, social, and governance ("ESG") related stocks since August.  Renewable energy

companies, like Pattern Energy, have benefited from positive ESG fund flows, better costs of financing and prolonged lower interest rates.  ESG fund flows in particular have had a staggering effect on valuations for renewable energy companies.

84.     Financial analysts have attributed the recent price appreciation of these companies not only to the better cost of financing and prolonged lower interest rates, but also to the continued growth in ESG investing and the significant fund flows that come with it.  According to Bloomberg fund flow data, in January 2020 alone, U.S. exchange traded funds ("ETFs") that invest in ESG related stocks have realized greater investment than they did in the entirety of 2018:

**Net Fund Flows into U.S. ESG-Related ETFs**

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | **Jan. 2020** |
|------|------|------|------|------|------|------|
| Assets (in millions) | $393 | $883 | $1,262 | **$2,017** | $7,884 | **$3,802** |
| Year Over Year Growth | 115% | 124% | 43% | 60% | 291% | |

85.     Since August 9, 2019, the last trading day prior to market rumors regarding a potential transaction with Pattern Energy, shares of the eight comparable companies ("Peers") selected by Evercore for the fairness opinion have, on average, appreciated in excess of 32.7%:

**Share Price Performance from August 9, 2019 through February 14, 2020**

| | Share Price (Local Currency) | | |
| --- | --- | --- | --- |
| | Aug 9, 2019 (Unaffected) | Feb 14, 2020 | % Change |
| **U.S. YieldCos[a]** | | | |
| NextEra Energy Partners LP (NYSE: NEP) | 49.24 | 60.06 | 22.0% |
| TerraForm Power Inc. (NASDAQ: TERP) | 16.18 | 20.56 | 27.1% |
| Clearway Energy (NYSE: CWEN) | 17.40 | 22.00 | 26.4% |
| **Canadian YieldCos[a]** | | | |
| Brookfield Renewable Partners LP (TSX: BEP-U CN) | 47.49 | 72.07 | 51.8% |
| Northland Power Inc. (TSX: NPI CN) | 25.62 | 31.55 | 23.1% |
| TransAlta Renewables (TSX: RNW CN) | 13.14 | 17.74 | 35.0% |
| Innergex Renewable Energy Inc. (TSX: INE CN) | 15.19 | 21.76 | 43.3% |
| **International YieldCos (Reference Only)[a]** | | | |
| Atlantica Yield (NASDAQ: AY) | 23.47 | 31.24 | 33.1% |
| **Average of Evercore Peers** | | | **32.7%** |
| **Pattern Energy** | 23.30 | 26.75[b] | **14.8%** |

[a] Peer set (U.S., Canadian, and International YieldCos) were based upon Evercore's financial analysis in the Proxy
[b] Merger consideration in the Proposed Transaction

86.     Once a potential merger is disclosed to the public, the market values the involved companies' stock based upon the terms of the merger.   Therefore, it is likely that Pattern Energy's share price has been anchored by the terms of the Proposed Transaction while the value of its Peers' traded securities have appreciated on average over 30% since the August 9, 2019 unaffected date.

87.     Had Pattern Energy's shares increased by a similar 30%, its share price would now be $30.29.  However, Pattern Energy shareholders are being offered Merger Consideration of just $26.75, *a significant discount from what the shares likely would have been worth today absent the announcement of the Proposed Transaction*. Therefore, the Proxy is materially false and misleading when it continuously touts that that the Merger Consideration is 14.8% more than

Pattern Energy's unaffected closing price on August 9, 2019 ($23.30) and purportedly represents a premium of approximately 15.1% over the 30-day volume weighted average price on the NASDAQ prior to that date.

88.     Additionally, Evercore performed a Selected Public Company Trading Analysis, which compared the value of similar companies to Pattern Energy (and the Merger Consideration).   However, Evercore utilized inputs from those comparable companies from November 1, 2019 and compared that with the inputs from Pattern Energy on August 9, 2019. However, as discussed, the value of these similar companies has soared in the intervening time, and the value of Pattern Energy likely would have as well absent the announcement of the Proposed Transaction.  Therefore, this comparison is materially misleading to shareholders.

89.     At a minimum, the Proxy, and Evercore's fairness opinion, should be updated to reflect these changed market conditions.

## CLASS ACTION ALLEGATIONS

90.     This class action is brought on behalf of all public shareholders of Pattern Energy.

91.     The Class is so numerous that joinder of all members is impracticable.  As of the close of business on the record date - January 31, 2020 - Pattern Energy represents that approximately 98,218,625 shares of Pattern Energy common stock were outstanding and entitled to vote on the Proposed Transaction.  Those shares were held or beneficially owned by hundreds, if not thousands, of individuals and entities located throughout the country.

92.     Questions of law and fact are common to the Class, including, among others, (i) whether Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder; (ii) whether the Individual Defendants and Pattern Development have violated Section 20(a) of the Exchange Act; (iii) whether Plaintiffs and the other members of the Class

would be irreparably harmed were the Proposed Transaction consummated; and (iv) whether the Class is entitled to injunctive relief as a result of Defendants' wrongful conduct.

93.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class will be harmed by Defendants' wrongful conduct if the Proposed Transaction closes without the additional disclosures referenced above.

94.     Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.   Plaintiffs have no interests which conflict with those of the Class.

95.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class.  Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

96.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false

forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## COUNT I

**On Behalf of Plaintiffs and the Class Against All Defendants for
Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

97.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

98.     Defendants disseminated a false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, in light of the circumstances under which they were made, omitted material facts necessary to make the statements therein not materially false or misleading.

99.     The Proxy was prepared, reviewed, and/or disseminated by the Defendants.  By virtue of their positions within Pattern Energy, the Defendants were aware of this information and their duty to disclose this information in the Proxy.

100.     The Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

101.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

102.    By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

103.    Because of the false and misleading statements in the Proxy, Plaintiffs and the Class will be harmed if the shareholder vote on the Proposed Transaction is allowed to proceed.

## COUNT II

### On Behalf of Plaintiffs and the Class Against the Individual Defendants and Pattern Development for Violations of Section 20(a) of the Exchange Act

104.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

105.    The Individual Defendants and Pattern Development acted as controlling persons of Pattern Energy within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions and participation in and/or awareness of Pattern Energy's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy filed with the SEC, the 20(a) Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of Pattern Energy, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

106.    The Individual Defendants and Pattern Development were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

107.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Pattern Energy, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The misrepresented information identified

above was reviewed by the Individual Defendants prior to voting on the Proposed Transaction. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

108.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered before recommending the Proposed Transaction to the Class.

109.   Pattern Development also had supervisory involvement in the day-to-day operations of Pattern Energy, as the majority of Pattern Energy's executive officers also were the most senior officials at Pattern Development. Additionally, Pattern Development had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, as it purported to have veto power over any proposed transaction under the Consent Agreement. Pattern Development also was involved in negotiating with parties throughout the sales process that resulted in the Proposed Transaction.

110.   By virtue of the foregoing, the Individual Defendants and Pattern Development have violated Section 20(a) of the Exchange Act.

111.   As set forth above, the Individual Defendants and Pattern Development had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants and Pattern

Development are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the Class will be irreparably harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

C.      Requiring Defendants to disclose the material information identified above which has been omitted from, or misrepresented in, the Proxy;

D.      In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiffs and the Class damages;

E.      Directing Defendants to account to Plaintiffs and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs respectfully request a trial by jury on all issues so triable.

Dated: February 25, 2020

Respectfully submitted,

By:  */s/ Brian E. Farnan*
Sue L. Robinson (Bar No. 100658)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
**FARNAN LLP**
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Emails: srobinson@farnanlaw.com
        bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

*Liaison Counsel for Plaintiffs*

Vincent R. Cappucci (*pro hac vice* forthcoming)
Andrew J. Entwistle (*pro hac vice* forthcoming)
Jonathan H. Beemer (*pro hac vice* forthcoming)
Jessica A. Margulis (*pro hac vice* forthcoming)
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10171
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
Email:  vcappucci@entwistle-law.com
        aentwistle@entwistle-law.com
        jbeemer@entwistle-law.com
        jmargulis@entwistle-law.com

*Lead Counsel for Plaintiffs*

Christopher J. Kupka (*pro hac vice* forthcoming)
**FIELDS KUPKA & SHUKUROV LLP**
1370 Broadway, 5th Floor - #5100
New York, New York 10018
Telephone:  (212) 231-1500
Facsimile:  (646) 851-0076
Email:  ckupka@fksfirm.com

*Of Counsel for Plaintiffs*