**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE PATTERN ENERGY GROUP INC. | ) | C.A. No. 20-275-MN-JLH |
| SECURITIES LITIGATION | ) | |
| ——————————————————— | ) | |

## <u>REPORT & RECOMMENDATION</u>

In this action challenging the purchase of Pattern Energy Group Inc. by the Canada Pension Plan Investment Board, Defendants move to dismiss the Amended and Consolidated Class Action Complaint. (D.I. 48, 50.) For the reasons that follow, I recommend that Defendants' motions to dismiss be GRANTED because (1) Plaintiffs fail to state claims for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, and (2) no federal claims remain in the case to support the exercise of supplemental jurisdiction over Plaintiffs' state-law claims.

## I.    BACKGROUND[1]

### A.    The Parties

This dispute arises from an agreement between Defendant Pattern Energy Group Inc. ("Pattern Energy") and the Canada Pension Plan Investment Board ("CPPIB") to merge Pattern Energy with a subsidiary of CPPIB. That agreement was announced on November 4, 2019. Plaintiffs are investment funds that owned Pattern Energy stock at the time of the merger. (D.I. 26 ("Compl.") ¶ 27.) Plaintiffs were all advised by their investment advisor, Water Island Capital, LLC ("Water Island Capital"). (*Id.*)

---

[1] The facts contained in this section are taken from the allegations in the Consolidated Amended Class Action Complaint (D.I. 26 ("Complaint")), documents it references or relies on, and matters of which the Court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

At all times relevant here, Pattern Energy was a Delaware Corporation with "principal executive offices" in San Francisco, California.  (*Id.* ¶ 28.)  Its business was operating wind and solar facilities in the United States, Canada, and Japan.  (*Id.* ¶ 52.)  Pattern Energy traded on the NASDAQ under the ticker PEGI and on the Toronto Stock Exchange under the ticker PEG from its initial public offering in 2013 until the merger.  (*Id.* ¶¶ 52, 56.)

Pattern Energy acquired the facilities that it operated by purchasing them from Defendant Pattern Energy Group 2 LP ("Pattern Development") and other sources.  (*Id.* ¶¶ 29, 52.)  Pattern Development was a Delaware limited partnership with "principal executive offices" in San Francisco.  (*Id.* ¶ 29.)  Its principal business was developing and selling renewable energy and transmission facilities, and it sold most of them to Pattern Energy.  (*Id.* ¶¶ 29, 53.)

Defendant Riverstone Holdings LLC ("Riverstone Holdings") is a Delaware limited liability company and is an energy and power-focused private investment firm.  (*Id.* ¶¶ 30, 54.)  Defendant Riverstone Pattern Energy II Holdings, L.P. ("Riverstone PE") is a Delaware limited partnership that owned an equity stake in non-party Pattern Energy Group Holdings 2 LP ("Pattern Development Holdings"), which was the holding company for Pattern Development.  (*Id.* ¶¶ 31, 49.)

According to the Complaint, "Riverstone [Holdings and its affiliates (collectively, "Riverstone")], including Riverstone PE [], held a controlling 70% equity interest in Pattern Development before the merger."  (*Id.* ¶¶ 30, 58.)  The remaining equity interest of Pattern Development was owned as follows: Pattern Energy held a 29% equity stake, and most of the remaining 1% was held by Pattern Development's management, many of whom also had high-level management roles at Pattern Energy.  (*Id.* ¶ 58.)  At the time of the merger, Pattern Development had a consent right that limited Pattern Energy's ability to transfer its interest in

Pattern Development to any third party without the consent of Pattern Development. (Compl. ¶¶ 13–15; Proxy Stmt. at 36.)

The individuals named as defendants in the Complaint include the members of Pattern Energy's Board at the time of the merger ("Board Defendants") and seven members of Pattern Energy's management team ("Management Defendants"). The Board Defendants are Alan R. Batkin, Edmund John Philip Browne, Richard A. Goodman, Douglas G. Hall, Patricia M. Newson, Mona K. Sutphen, and Michael Garland. (Compl. ¶¶ 32–39.). The Management Defendants are Michael Garland, Hunter Armistead, Daniel Elkort, Michael Lyon, Deborah McAdam, Esben Pedersen, and Christopher Shugart. (*Id.* ¶¶ 40–46.). Defendant Garland was the CEO of both Pattern Energy and Pattern Development as well as a member of the boards of directors at both companies. (*Id.* ¶ 38.)

### B.    The Proxy Statement

Plaintiffs' federal claims are all based on their contention that the proxy materials sent to Pattern Energy shareholders in connection with the merger contained material misrepresentations and omissions. The February 4, 2020 proxy statement is 138 pages, single-spaced, plus attachments. (D.I. 52, Ex. B ("Proxy Stmt.")[2].) It contains an 18-page summary of the merger negotiations. (*Id.* at 36–54.) The portions of that summary that are most relevant to this dispute are as follows.

On June 5, 2018, Pattern Energy's Board decided to begin exploring "strategic opportunities," including opportunities to merge. (*Id.* at 36.) At the same meeting, the Board appointed a Special Committee composed of independent directors to conduct its strategic review.

---

[2] While Plaintiffs did not attach to their Complaint copies of the SEC filings on which their Exchange Act claims are based, no one disputes that the Court may properly consider those filings when ruling on the pending motions.

(*Id.* at 36–37; Compl. ¶ 63.)   The initial Special Committee included, among others, Board Defendants Batkin (who was appointed Chairperson), Hall, and Newson.  (Proxy Stmt. at 36–37; Compl. ¶¶ 32, 35–36.)  Board Defendants Goodman and Sutphen were later appointed to the Special Committee in February 2019.  (Proxy Stmt. at 39; Compl. ¶¶ 34, 37.)

The Special Committee retained outside legal counsel, and it retained Evercore Group L.L.C. ("Evercore") as its financial advisor.  (Proxy Stmt. at 37; Compl. ¶ 65.)  The Special Committee later retained Goldman Sachs & Co. ("Goldman Sachs") as a second financial advisor. (Proxy Stmt. at 40; Compl. ¶ 65.)

The Proxy Statement disclosed that members of Pattern Energy's management were involved in the company's negotiations regarding a potential merger.  For example, at an October 29, 2018 meeting of the Special Committee, CEO Garland—who was not a member of the Special Committee—"summarized the approaches he had received from representatives of a large alternative asset manager (referred to [in the Proxy Statement] as 'Party A') which owns a substantial interest in a company in the alternative energy industry (referred to [in the Proxy Statement] as 'Company A') and separately by a large private equity investment firm that also owns a company in the alternative energy business (referred to [in the Proxy Statement] as 'Party B') with respect to a potential transaction involving Pattern [Energy]."  (Proxy Stmt. at 37; Compl. ¶¶ 67, 71.)  The next day, the Special Committee "instructed Mr. Garland to contact senior executives at Party A and Party B to assess whether they would provide a preliminary written proposal for a strategic transaction involving Pattern [Energy] . . . ."  (Proxy Stmt. at 37; Compl. ¶ 72.)

Thereafter, in early November 2018, the Special Committee provided "conduct guidelines" for non-members' (*e.g.*, management's) participation in the strategic review process.  (Proxy Stmt. at 37–38; Compl. ¶ 66.)  As disclosed in the Proxy Statement, those guidelines provided for,

> among other things, a prohibition on members of Pattern [Energy] management engaging with any potential parties to a strategic transaction without the express consent of the Special Committee and a prohibition on members of management discussing either the participation of, or compensation to be paid to, management by any potential transaction party or the inclusion of Pattern Development until the Special Committee had determined that it had sufficient visibility into the key terms of any such proposed transaction, including price.

(Proxy Stmt. at 37–38.)

With the permission of the Special Committee, Garland and other members of Pattern Energy management reached out to representatives of Party A and Party B to discuss a potential transaction.  (*Id.* at 38; Compl. ¶¶ 67, 72.)  Party B indicated that it was not interested, but discussions continued with Party A.  (*Id.*)  On January 16, 2019, Garland reported to the Board that

> he and other members of Pattern [Energy] management had, at the direction of representatives of the Special Committee, met with representatives of Party A and had engaged in initial discussions regarding a potential strategic transaction involving Pattern, Party A, and Company A . . . .  Mr. Garland also indicated his desire to set up a meeting with representatives of a company operating in the alternative energy industry (referred to [in the Proxy Statement] as "Party C"), which might logically be interested in a transaction with Pattern [Energy].

(Proxy Stmt. at 38.)  The Board authorized management's outreach to Party C; however, Party C indicated to Garland that it was "unlikely to engage in a transaction with Pattern [Energy]."  (*Id.* at 38–39.)

At a February 21, 2019, meeting of the Special Committee, Pattern Energy's management reported "recent interest indicated by representatives of an entity controlled by a former member of [Pattern Energy's] Board who later partnered with a private equity investment firm" (dubbed "Party D"). (*Id.* at 39.)  Pattern continued discussions with Party D, and some of those discussions included Riverstone—which, as explained above, owned a majority interest in Pattern Development, which, in turn, had a consent right "that limit[ed] [Pattern Energy's] ability to merge with, or to transfer its [29%] interest in Pattern Development to, any third party without Pattern Development's consent." (*See, e.g.*, *id.* at 36, 50; Compl. ¶¶ 88–91.)

Also on February 21, 2019, Party A sent "a preliminary non-binding term sheet outlining high-level proposed terms for a potential transaction" involving the acquisition of Pattern Energy by a company controlled by Party A in exchange for Company A stock. (Proxy Stmt. at 39; Compl. ¶ 73.)  The Special Committee authorized Mr. Batkin to continue discussions with, and serve as the Special Committee's representative to, Party A.  (Proxy Stmt. at 39.)  Pattern Energy's discussions with Party A continued for the better part of a year. (*Id.* at 39–53; Compl. ¶¶ 69, 74–86.)

Beginning in April 2019, some of the discussions between Pattern Energy and Party A included Riverstone.  (Proxy Stmt. at 40; Compl. ¶ 74.)  At a meeting between Batkin, Pattern Energy's management, Party A representatives, and Riverstone representatives on April 16, 2019, Riverstone indicated that it would be amenable to proposals from Party A that included the acquisition of Pattern Development.  (Proxy Stmt. at 40; Compl. ¶ 75.)  Months later, at a meeting between Garland, Party A representatives, and Riverstone representatives on September 4, 2019, Party A and Riverstone "indicated that they would not be supportive of a combination of Pattern [Energy] and Company A absent certain changes to the agreements governing the commercial

relationship between Pattern [Energy] and Pattern Development."  (Proxy Stmt. at 48; Compl. ¶ 81.)  Thereafter, Batkin informed Party A that, although Party A had proposed a competitive offer to acquire Pattern Energy, Party A would need to "confirm, either that (1) Party A's proposal was not conditioned on Party A entering into agreements with Pattern Development and Riverstone or (2) Party A had negotiated definitive drafts of such agreements with Pattern Development." (Proxy Stmt. at 51; Compl. ¶ 83.)

While the discussions with Party A and others continued, Pattern Energy was also in talks with CPPIB.  On April 15, 2019, Garland had a meeting with representatives of CPPIB and Riverstone, during which CPPIB indicated that it was potentially interested in acquiring Pattern Energy.  (Proxy Stmt. at 40.)  The Special Committee was informed about the meeting and CPPIB's interest, and it authorized Pattern Energy's management to engage in discussions with CPPIB, which continued throughout the summer and fall.  (*Id.* at 40–53; Compl. ¶¶ 93–94.)

In August 2019, the media picked up on the possible sale of Pattern Energy, creating a spike in interest from five new parties, but none of them pursued a transaction.  (Proxy Stmt. at 44–45.) The media attention also prompted Party B to revise its position and engage in discussions with Pattern Energy.  (*Id.*)  By October 2019, only Party A, Party B, Party D, and CPPIB had expressed continued interest in acquiring Pattern Energy.

On October 17, 2019, Evercore, at the request of the Special Committee, asked Party A, Party D, and CPPIB to submit proposed definitive documentation by October 23, 2019 and "best and final" offers by October 28, 2019.  (*Id.* at 51; Compl ¶¶ 84, 92, 94.)  Evercore did not request a final offer from Party B after it learned that Party B was not interested in going forward.  (Proxy Stmt. at 51.)  Party D also declined to submit a proposal.  (*Id.* at 52; Compl. ¶ 92.)

On October 28, 2019, CPPIB submitted a final all-cash offer of $26.75 per share for the outstanding shares of Pattern Energy.  (Proxy Stmt. at 52; Compl. ¶ 94.)  CPPIB's offer—which was ultimately accepted—contemplated a concurrent acquisition of Pattern Development.  (Proxy Stmt. at 53; Compl. ¶¶ 2–3, 94.)

Also on October 28, 2019, Party A submitted an offer to acquire Pattern Energy in an all-stock transaction involving the combination of Pattern Energy and Company A, with Pattern Development remaining a separate entity.  (Proxy Stmt. at 52; Compl. ¶ 85.)  Party A did not submit any transaction documentation on October 28, 2019.  (Proxy Stmt. at 52.)  On October 30, 2019, Party A submitted a draft merger agreement that conditioned closing on Riverstone's consent to certain changes to Pattern Development's existing contractual relationships with Pattern Energy.  (*Id.*; Compl. ¶ 85.)  Later that day, counsel for the Special Committee communicated to Party A that it would need to finalize any arrangements with Riverstone that Party A believed necessary and to submit executable transaction documentation prior to close of business on November 2, 2019.  (Proxy Stmt. at 52; Compl. ¶¶ 85–86.)  Party A indicated that it believed it could negotiate such amendments within 30 days, but counsel for the Special Committee reiterated their request for executable transaction documentation by November 2.  (*Id.*)  On November 2, representatives of Party A told counsel for the Special Committee that Party A would not be submitting a final proposal.  (Proxy Stmt. at 52; Compl. ¶ 87.)

On November 3, 2019, Evercore opined to the Special Committee that CPPIB's offer of $26.75 per share was fair from a financial point of view.  (Proxy Stmt. at 53; Compl. ¶ 95.)  The Special Committee recommended that the Board approve the merger, which it did.  (Proxy Stmt. at 53; Compl. ¶ 96.)  After Pattern Energy and CPPIB signed the merger agreement, Evercore and

Goldman Sachs contacted 16 potential bidders during the "go-shop" period.  (Proxy Stmt. at 54.)
The contacted parties either did not respond or declined to pursue a transaction.  (*Id.* at 53.)

### C.      The Proposed Merger

Pattern Energy's Board filed with the Securities and Exchange Commission (SEC) a
Schedule 14A Definitive Proxy Statement (the "Proxy Statement") on February 4, 2020, detailing
the merger negotiations that had occurred and recommending that shareholders vote to approve
the merger at a special shareholder meeting scheduled for March 10, 2020.  (Proxy Stmt. at 1, 36–
54; Compl. ¶ 97.)

The Proxy Statement explained that, pursuant to the merger transaction, Pattern Energy
would be merged with a newly formed affiliate of CPPIB.  (Proxy Stmt. at 53–54, 74; Compl.
¶ 48.)  In exchange, shares of Pattern Energy Company Common Stock would be converted to the
right to receive $26.75 in cash.  (Proxy Stmt. at 53; Compl. ¶¶ 2, 119.)

The Proxy Statement further disclosed that, pursuant to a concurrent transaction—dubbed
the "Contribution Agreement"—the Management Defendants and Riverstone (through Riverstone
PE) would be contributing their respective stakes in Pattern Development to an affiliate of CPPIB
in exchange for equity interests in the affiliate.  (Proxy Stmt. at 74; Compl. ¶¶ 2–3, 48, 96, 120.)
The combined result of the Pattern Energy merger and the acquisition of Pattern Development
pursuant to the Contribution Agreement was that Pattern Energy and Pattern Development would
be under the common ownership of CPPIB.  (Proxy Stmt. at 74; Compl. ¶¶ 2, 120; *see also* Compl.
at 94 (Appendix A, Glossary of Defined Terms) (defining "Pattern Development Transaction").)

The Proxy Statement attached Evercore's November 4, 2019 written "opinion that . . . the
Merger Consideration to be received by holders of the Company Common Stock . . . in the Merger
is fair, from a financial point of view, to such holders." (Proxy Stmt. at C-1–4; Comp. ¶ 97.)  The

Proxy Statement included a summary of the information Evercore considered "in connection with rendering" its opinion, and it also disclosed that Evercore's analysis employed "an implied value for [Pattern Energy's] ownership in Pattern Development." (Proxy Stmt. at 59–60, 63, C-3.) The Proxy Statement specifically disclosed that Evercore's opinion "d[id] not address, . . . the fairness or any other aspect of" the Contribution Agreement "to, or any consideration received in connection therewith by, the holders of any securities of [Pattern Development Holdings]." (*Id.* at 60–61, C-2–3; Compl. ¶ 123; Tr. 35:5–10, 37:1–9, 42:3–7.)

### D.  The Backlash

The Proxy Statement quickly garnered negative attention, including from Plaintiffs' financial advisor, Water Island Capital, which issued two critical open letters, dated February 18 and 24, 2020. The letters attacked the sufficiency of the disclosures in the Proxy Statement, particularly the lack of disclosure around the terms of the Contribution Agreement. (Compl. ¶¶ 98–104.)

Water Island Capital was not the only one critical of Pattern Energy's disclosures. Institutional Shareholder Services ("ISS"), a proxy advisory service, issued a report on February 28, 2020, recommending that Pattern Energy shareholders vote against the proposed merger. (*Id.* ¶¶ 105–08.) The ISS report pointed out that Pattern Energy shareholders "have no visibility into the price being paid for [Pattern Development]" and that "shareholders of [Pattern Energy], which holds a 29 percent stake in [Pattern Development], may be reasonably frustrated by this lack of transparency." (*Id.* ¶¶ 8, 10, 107.) The report further explained that "[h]ow the total price tag for publicly traded Pattern Energy and the private [Pattern Development] is split represents a zero-sum game for CPPIB, the buyer; for [Pattern Energy] shareholders, however, that figure is

10

critically important in assessing whether [the merger] transaction maximizes shareholder value."

(*Id.*)

The ISS report also pointed out that Pattern Energy shareholders lacked adequate information to assess the impact of management's interest in the concurrent transaction with Pattern Development:

> [S]hareholders have a very limited view into management's incentives on the [Pattern Development] related transaction, preventing them from concluding definitively that these incentives did not outweigh the incentives on the [Pattern Energy] side. While this concern is mitigated by the existence of a special committee of independent directors, it seems clear from the proxy statement's summary of the sale process that management represented the company in a number of discussions with potential bidders, particularly during the earlier stages. Although the sale process began in June 2018 . . . it wasn't until Aug. 28, 2019 that the special committee determined management should have its own attorneys because of management's interest in [Pattern Development].

(*Id.* ¶¶ 64, 108.)

Similarly, on March 2, 2020, Glass, Lewis & Co., LLC, another proxy advisory service, reported that Water Island Capital

> has raised a number of valid questions regarding the process that resulted in the [CPPIB] transaction and the appearance of potential conflicts of interest and other impediments that may have prevented [Pattern Energy] stockholders from realizing greater value in the proposed transaction or in an alternative transaction involving another counterparty.   These issues primarily relate to the Company's unique business structure (i.e., shared management and contractual agreements with [Pattern Development], in which the Company owns a 29% stake and Riverstone owns 70%), the concurrent transaction between [Pattern Development] and [CPPIB], and management's and other parties' direct or indirect interests in Pattern Energy and/or [Pattern Development].

(*Id.* ¶ 109.)   The Glass Lewis report further stated that "disclosing the details of the [Pattern Development] transaction would clearly show whether [Pattern Energy] stockholders are

potentially forgoing any value in order to subsidize a payout to the other owners of [Pattern Development] (i.e., management, Riverstone, and PSP, the latter of which has an indirect stake)." (*Id.* ¶¶ 110–11.)

E.     **The Supplemental Disclosures**

Pattern Energy responded to the negative publicity in several ways. After the first letter from Water Island Capital, Pattern Energy issued a press release, which it attached to a February 19, 2020 Form 8-K. (Compl. ¶ 99.) Pattern Energy responded to Water Island Capital's second letter with another press release, which it attached to a February 26, 2020 Form 8-K. (*Id.* ¶¶ 101–04; *see* Pattern Energy Grp., Inc., Current Report, Ex. 99.1 (Form 8-K) (Feb. 26, 2020)[3] ("February 26 Press Release").) In the February 26 Press Release, the Board reiterated its opinion that the merger's terms were fair and that the value received by Pattern Energy for its 29% stake in Pattern Development was consistent with what Riverstone had received for its stake under the Contribution Agreement. (February 26 Press Release.) The February 26 Press Release was incorporated by reference into the Proxy Statement. (Compl. ¶ 121.)

In addition to the two press releases, Pattern Energy filed with the SEC Schedule 14A Definitive Additional Materials (the "Supplemental Proxy Statement") on March 4, 2020, which disclosed additional details related to the merger and the Contribution Agreement. (*Id.* ¶¶ 4, 112; D.I. 52, Ex. C ("Proxy Stmt. Supp.").) Among other things, the Supplemental Proxy Statement explained how Evercore assessed the value of Pattern Energy's 29% stake in Pattern Development for the purpose of assessing the fairness of the merger consideration being offered by CPPIB:

> The effective value of Pattern Development (as of the signing of the Merger Agreement) was $1.06 billion, based on CPPIB's

---

[3] The February 26 Press Release is available online via the SEC's EDGAR database at https://www.sec.gov/Archives/edgar/data/1561660/000095014220000593/eh2000383_ex9901.htm.

> contribution of its interest of Pattern [Energy] acquired under the Merger Agreement to the joint venture that will own Pattern [Energy] and Pattern Development following the closing of the Merger. . . .   The invested capital by Pattern [Energy] in Pattern Development as of December 31, 2019 was $190 million, and the total capital invested in Pattern Development as of December 31, 2019 was $650 million.  Based on the effective value of $1.06 billion of Pattern Development, the invested capital multiple to be paid by CPPIB in its proposed acquisition of Pattern Development is 1.63x.  The proposed 1.63x invested capital multiple compares to management's publicly stated investment target of a 2.0x invested capital multiple over the life of the investment.  The lower multiple reflects the early stage and higher risk of the projects currently in the Pattern Development pipeline.

(Proxy Stmt. Supp. at 6; Compl. ¶ 112.)

Notwithstanding the additional disclosures, ISS continued to recommend that the shareholders vote against the merger.  On March 9, 2020, ISS stated that the Supplemental Proxy Statement "does not provide shareholders with sufficient detail to definitively conclude whether they are receiving a fair proportion of the value of a combined [Pattern Energy] and [Pattern Development]."  (Compl. ¶¶ 9, 114.)

Despite the public criticisms about the lack of shareholder visibility into the concurrent Pattern Development deal, Pattern Energy's shareholders voted to approve the merger at the special meeting on March 10, 2020.  (*Id.* ¶ 115.)

### F.   Procedural History

Plaintiffs filed this action on February 25, 2020, two weeks before the shareholder vote.  (D.I. 1.)  Plaintiffs filed the now-operative pleading, the Consolidated Amended Class Action Complaint, on May 22, 2020.  (D.I. 26.)

Count I of the Complaint alleges violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), against Pattern Energy, the Board Defendants, the Management Defendants, and Pattern Development.   Count II alleges violations of Section 20(a) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), against the Board Defendants, the Management Defendants, and Pattern Development. Count III is a state-law breach of fiduciary duty claim against the Board Defendants and the Management Defendants. Count IV alleges that Riverstone Holdings and Riverstone PE are liable for aiding and abetting the breaches of fiduciary duties.

Pending before the Court are two motions to dismiss. On July 21, 2020, Riverstone Holdings, Riverstone PE, and Pattern Development filed a motion to dismiss for failure to state a claim. (D.I. 48.) Also on July 21, 2020, Pattern Energy, the Board Defendants, and the Management Defendants filed a motion to dismiss for failure to state a claim. (D.I. 50.) Each motion purports to incorporate by reference the arguments made in the other motion. (D.I. 49 at 1 n.1; D.I. 51 at 1.) Briefing was complete as of November 5, 2020. I heard oral argument on November 12, 2020.[4]

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss for Failure to State a Claim

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[4] I ordered the parties to focus their argument on two issues: "(1) whether the Consolidated Amended Class Action Complaint (D.I. 26) plausibly alleges an actionable misstatement or omission; and (2) whether the Court should dismiss the state law claims pursuant to the forum selection clause and, if so, the appropriate procedural mechanism for doing so." (D.I. 67.)

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  A possibility of relief is not enough.  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In determining the sufficiency of a complaint, I must assume all "well-pleaded facts" are true but need not assume the truth of legal conclusions.  *Id.* at 679.  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Twombly*, 550 U.S. at 558 (internal quotation marks omitted).

### B.    Exchange Act Pleading Requirements

Section 14(a) of the Securities Exchange Act of 1934 "makes it unlawful to solicit a proxy 'in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'"  *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 709 (3d Cir. 2020) (quoting 15 U.S.C. § 78n(a)(1)) (alteration in original).  "It 'seeks to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosures in proxy solicitations.'"  *Id.* at 709–10 (quoting *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006)).  SEC Rule 14a-9, in turn, prohibits any proxy solicitation

> containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

Liability under Section 14(a) requires a showing that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Jaroslawicz*, 962 F.3d at 710 (quoting *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007)).  However, an omission in a proxy statement can violate Section 14(a) only "where '[(a)] the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or [(b)] the omission makes other statements in the proxy statement materially false or misleading.'"  *Id.* (quoting *Seinfeld*, 461 F.3d at 369) (alterations in original).  In other words, absent an allegation that a defendant failed to make a disclosure specifically required by SEC regulations, a Section 14(a) plaintiff must demonstrate that a proxy statement is either materially false or misleading standing alone, or is materially misleading in light of other facts that were not disclosed (*i.e.*, omitted).  *Hysong v. Encore Energy Partners LP*, No. 11-781, 2011 WL 5509100, at *6 (D. Del. Nov. 10, 2011).

Section 14(a) claims are subject to certain heightened pleading requirements set forth in the Private Securities Litigation Reform Act.  *Kooker v. Baker*, No. 19-1299-CFC, 2020 WL 6287248, at *3 (D. Del. Oct. 27, 2020); *In re U.S. West Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 305 (D. Del. 2002).  In particular, the PSLRA requires that a Section 14(a) claim premised on an alleged false or misleading proxy statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see also Hysong*, 2011 WL 5509100, at *6 ("[I]n order to plead facts to sufficiently allege . . . a section 14(a) claim, a plaintiff must identify a precise statement in the proxy that is either affirmatively misleading in

16

and of itself, or is rendered misleading by operation of a materially omitted fact."); *Heinze v. Tesco Corp.*, 971 F.3d 475, 480 (5th Cir. 2020) ("Even for omission-based claims, the plaintiff must identify specific 'statements [in the proxy statement]' that are rendered 'false or misleading' by the alleged omissions.").   The court must dismiss a complaint that fails to satisfy those requirements.  15 U.S.C. § 78u-4(b)(3)(A).

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ."  15 U.S.C. § 78t(a).  To state a claim under Section 20(a), the plaintiff must plead, among other things, an underlying Exchange Act violation by a controlled person or entity.  *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 159 n.21 (3d Cir. 2004) ("The lack of any predicate violation of the Securities Exchange Act of 1934 compels dismissal of control person claims.").

## III.   DISCUSSION

Underlying all of Plaintiffs' claims is their contention that Pattern Energy's Board allowed its management, Riverstone, and Pattern Development to push the merger negotiations toward a merger with CPPIB that would include Pattern Development—and away from a more favorable transaction with Party A for Pattern Energy alone—resulting in less consideration for Pattern Energy's shareholders.

But to move forward on their federal securities claims—which are the reason this case is before this Court instead of the Delaware Court of Chancery—Plaintiffs need to identify a statement in the Proxy that is either materially false or misleading on its own, or is materially

misleading in light of other facts that were not disclosed (*i.e.*, omitted.).[5]   Notwithstanding the length of the Complaint—253 paragraphs spanning 88 pages—Plaintiffs fail to identify such a statement.  Their Section 14(a) claim must therefore be dismissed.  And their failure to plead an underlying violation of Section 14(a) is fatal to their Section 20(a) claim.  Because I recommend dismissing all of Plaintiffs' federal claims, I also recommend that the Court decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims.

A.      **Section 14(a) Claim**

Plaintiffs point to 26 statements in the Proxy Statement, the Supplemental Proxy Statement, and the February 26 Press Release[6] that, Plaintiffs contend, are "false and misleading."  (*See* D.I. 61, Ex. 3 ("Chart of Alleged Proxy Misstatements").)  Plaintiffs group those statements into six categories: (1) statements about the fairness of the merger; (2) statements about the terms of alternate bids; (3) statements relating to Pattern Development's consent right; (4) statements regarding Pattern Energy management's role in the negotiations; (5) statements regarding valuation metrics; and (6) statements about the shareholder vote on the merger.  (*Id.*)  I take each category in turn.

1.      **Statements about the fairness of the merger**

Plaintiffs' first category contains six statements from the Proxy Statement, the Supplemental Proxy Statement, and the February 26, 2020 press release that, Plaintiffs contend, are "false and misleading":

---

[5] The Complaint does not allege—nor do Plaintiffs argue—that the Proxy Statement failed disclose something specifically required to be disclosed pursuant to SEC regulations.

[6] For purposes of the pending motions to dismiss, Defendants acknowledge that a false or misleading statement in the February 26 Press Release could be the basis of a Section 14(a) claim. (Tr. 19:15–20:9.)

1. "[T]he parties to the Contribution Agreement [(including CPPIB, Riverstone, and Pattern Development management)] will make certain contributions contemplated by the Contribution Agreement, including with respect to their interests in [Pattern Development Holdings] in exchange for equity interests in [a new CPPIB affiliate] or the Surviving Corporation, and [Pattern Energy] and [Pattern Development Holdings] will be under common ownership."  (Proxy Stmt. at 74; Compl. ¶ 120.)

2. "The value attributed to [Pattern Energy's] interest in Pattern Development by the Special Committee's financial advisor is consistent with the value received by Riverstone for its interest in Pattern Development."  (February 26 Press Release; Compl. ¶ 121.)

3. "Our Board, following the recommendation of the Special Committee, has approved the Merger Agreement and the Merger and determined that the Merger Agreement and the Merger are advisable, fair to and in the best interests of Pattern [Energy] and our stockholders."  (Proxy Stmt. at 105; Compl. ¶¶ 122, 130.)

4. "Based upon and subject to the foregoing, it is our [Evercore's] opinion that, as of the date hereof, the Merger Consideration to be received by holders of the [Pattern Energy] Common Stock . . . in the Merger is fair, from a financial point of view, to such holders."  (Proxy Stmt. at C-4; Compl. ¶ 123.)

5./6. "The invested capital by Pattern [Energy] in Pattern Development . . . was $190 million, and the total capital invested in Pattern Development . . . was $650 million. Based on the effective value of $1.06 billion of Pattern Development, the invested capital multiple to be paid by CPPIB in its proposed acquisition of Pattern Development is 1.63X."  (Proxy Stmt. Supp. at 6; Compl. ¶¶ 126, 128.)

(See D.I. 61, Ex. 3 at 1–3.)  According to Plaintiffs, the above statements are false and misleading because the Proxy Statement does not disclose to Pattern Energy shareholders the precise terms of the Contribution Agreement, including (a) what Riverstone and Pattern Energy management received from CPPIB in exchange for their shares in Pattern Development, and (b) the value that Pattern Energy received from CPPIB for its 29% stake in Pattern Development.  (D.I. 60 at 14–16.)  Plaintiffs contend that, without additional information, it was impossible for Pattern Energy shareholders to assess whether they were foregoing higher merger consideration to subsidize CPPIB's concurrent acquisition of Pattern Development.  (*Id.*; *see also* D.I. 61, Ex. 3 at 1–3.)

I appreciate that Plaintiffs wanted additional information about the Pattern Development transaction. And, for purposes of the argument, I will accept as true Plaintiffs' contention that the undisclosed terms of that transaction would have been material to a reasonable shareholder in deciding how to vote. But Section 14(a) does not require the disclosure of all material information. *In re Keryx Biopharmaceuticals, Inc.*, 454 F. Supp. 3d 407, 415 (D. Del. 2020) ("There is no duty to disclose all material information under § 14(a)."); *Hysong*, 2011 WL 5509100, at *8 ("A plaintiff's desire to know information that may be material . . . is not enough to state a claim under Section 14(a) . . . ."); *see also Heinze*, 971 F.3d at 483 (holding that "pure-omission claims are not cognizable" under Section 14(a)). Rather, an omission-based claim is actionable under Section 14(a) only if the proxy statement "omits to state any material fact necessary in order to make the statements therein not false or misleading." *Seinfeld*, 461 F.3d at 369 (quoting 17 C.F.R. § 240.14a-9(a)); *see also Heinze*, 971 F.3d at 483; *Keryx*, 454 F. Supp. 3d at 415.

Applying the correct legal standard, it is clear that none of the above six statements can support a Section 14(a) claim. Statement 1 is a true statement, and Plaintiffs do not seriously contend otherwise: under the Contribution Agreement, Riverstone and Pattern Energy management contributed their respective stakes in Pattern Development to a CPPIB affiliate in exchange for equity interests in the affiliate. (*See* Compl. ¶¶ 2–3 (alleging that Riverstone and the Management Defendants contributed their interests in Pattern Development in exchange for an interest in a CPPIB affiliate); *see also* Tr. 39:10–17.) Additional, undisclosed details about the value that they received does not render misleading the statement that they received something.[7]

---

[7] Plaintiffs' reliance on *Hurwitz v. LRR Energy, L.P.*, 241 F. Supp. 3d 492 (D. Del. 2017) is misplaced. In *Hurwitz*, the court determined that a proxy statement omitted a debt ratio that revealed that the company would likely not be able to meet its obligations under a corresponding debt covenant, leading to reduced distributions to shareholders—an omission that the court found material. 241 F. Supp. 3d at 502–03. The court further found that the omitted material conflicted

Statements 2, 5, and 6 are about the financial advisor's "attribut[ion]" and assignment of an "effective value" to Pattern Energy's interest in Pattern Development that was "consistent with the value received by Riverstone." Plaintiffs do not argue that those statements are false or misleading on the basis that Evercore *did not* attribute the value that it said it did. Rather, Plaintiffs argue that Evercore's analysis was arbitrary and incomplete. (D.I. 60 at 16; Compl. ¶¶ 126–29.) In other words, Plaintiffs disagree with how Evercore did its assessment, including the valuation metrics it used. But that does not make otherwise accurate statements about the assessment that was performed false or misleading. *See Seinfeld*, 461 F.3d at 374 (proxy statement's failure to employ plaintiff's preferred valuation model did not render proxy statement "false or misleading"); *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor."). And Plaintiffs have not disputed that the statements in the Proxy Statement and Supplement were accurate as to what Evercore did do and what it did not do.[8] (Compl. ¶ 123; Tr. 35:5–10, 37:1–9, 42:3–7.)

---

with statements in the proxy relating to the company's ability to meet its debt covenant obligations and make consistent distributions. *Id.* at 503–504. In other words, the omitted material revealed that the statements that were made were false and misleading. Contrary to Plaintiffs' suggestion, *Hurwitz* does not stand for the proposition that a company is required to provide "the numbers required to calculate" all material information. As explained above, a Section 14(a) plaintiff must tie the omitted information to a misleading statement.

[8] Plaintiffs suggest that the statement that Riverstone received "consistent" value for its stake in Pattern Development was materially misleading because it suggested that Evercore assessed the Pattern Development transaction in rendering its fairness opinion. As Plaintiffs acknowledge, however, the Proxy Statement explicitly states that Evercore did not assess the Pattern Development transaction in rendering its fairness opinion. In other words, the information that allegedly makes the challenged statement misleading was not omitted at all—it was disclosed.

Statements 3 and 4—that the Board and Evercore believed that the merger transaction was fair—are statements of opinion.  The Complaint does not allege that those opinion statements were literally false, that is, that the Board and/or Evercore had a contrary subjective belief.  *Jaroslawicz*, 962 F.3d at 717 (holding that a Section 14(a) claim premised on a false statement of opinion requires an "allegation that [the defendant] offered an insincere opinion").  And I agree with Defendants that Statements 3 and 4 are not actionable misleading opinion statements.  As the Third Circuit recently explained, "an opinion statement is misleading if it 'omits material facts' about the 'inquiry into or knowledge concerning a statement of opinion.'"  *Jaroslawicz*, 962 F.3d at 717 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)).[9]  However, "liability attaches only 'if those facts conflict with what a reasonable investor would take from the statement itself.'"  *Id.* (quoting *Omnicare,* 575 U.S. at 189).  "Alleging an actionable claim under this theory 'is no small task,' . . . because a reasonable investor 'understand[s] that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 189–90, 194).  Among other things, a plaintiff relying on this theory must identify "one or more facts left out" that render the challenged opinion statement misleading.  *Omnicare*, 575 U.S. at 195.

---

[9] In *Jaroslawicz*, the Third Circuit stated that *Omnicare* "provides the relevant framework" for assessing whether an opinion statement is misleading, but the Court expressly declined to "resolve [the] question" of "whether *Omnicare* applies to claims brought under the Exchange Act and under Section 14(a)."  962 F.3d 701, 717–18 n.16 (3d Cir. 2020) ("assuming Omnicare's holding applies" and dismissing claim that alleged a misleading statement of opinion).  I take the Court's holding to mean that failure to satisfy the *Omnicare* framework requires dismissal of a Section 14(a) claim, even though the Third Circuit might later determine that misleading opinion statements are not actionable under Section 14(a).

Plaintiffs contend that opinion Statements 3 and 4 were misleading because they inaccurately suggested that Evercore (as the Board's financial advisor) had assessed the value of the concurrent Pattern Development transaction in developing its fairness opinion. The problem with that argument is that the Proxy Statement did not leave out material facts about Evercore's "inquiry into" the Pattern Development transaction. *Jaroslawicz*, 962 F.3d at 717. Rather, as Plaintiffs acknowledge, the Proxy Statement explicitly disclosed to shareholders that Evercore did not take it into account in rendering its opinion. *Id.* at 718 (affirming dismissal of Section 14(a) claim challenging a misleading opinion statement where, "even if a reasonable investor would have expected" the company to do a more rigorous assessment, the proxy statement "provided enough information to understand what the [company] did, information enough to decide how to vote").

### 2.    Statements about the terms of alternate bids

Plaintiffs' second category contains two statements that, Plaintiffs contend, are "false and misleading":

7.    "On August 27, 2019, Pattern [Energy] received a non-binding letter of interest from Party B indicating an interest in acquiring the outstanding shares of Company Common Stock for between $25.00 and $28.00 per share in cash, subject to confirmatory due diligence." (Proxy Stmt. at 46; Compl. ¶ 135.)

8.    "On September 20, 2019, representatives of Party D sent Mr. Batkin, Mr. Garland and Riverstone Representatives a non-binding proposal in which Party D offered to acquire the outstanding shares of Company Common Stock at a price of $26.75 per share in cash. Party D's non-binding proposal contemplated that Party D would acquire Pattern [Energy] and Pattern Development, but did not expressly indicate whether the acquisitions of Pattern [Energy] and Pattern Development would be cross-conditioned. Party D requested a 30-day period of exclusivity to negotiate definitive documentation." (Proxy Stmt. at 49; Compl. ¶ 137.)

(D.I. 61, Ex. 3 at 3–4.) Plaintiffs say that those statements are false and misleading because the Proxy Statement omitted "(i) whether these Parties were told by Defendants that Pattern Energy

could not be acquired without Pattern Development; or (ii) whether they offered to acquire both Pattern Energy and Pattern Development, and if so, at what price."  (D.I. 60 at 16.)

Conclusory assertions aside, Plaintiffs do not really contend that either of the above statements were "false" in the normal usage of the term, *i.e.*, not true.  And I agree with Defendants that neither statement is actionably misleading.  Neither statement makes any representation about the facts that are alleged to have been omitted, implied or otherwise.

Notably, Plaintiffs do not allege that certain discussions between Defendants, Party B, and Party D did (or did not) happen and that the omission of those discussions from the Proxy Statement made the above statements misleading.  Rather, Plaintiffs want to know "whether" such discussions happened.  But that is nothing more than a request for more information.  And "[a] plaintiff's desire to know information that may be material . . . is not enough to state a claim under Section 14(a)."  *Hysong*, 2011 WL 5509100, at *8.[10]

### 3.	Statements relating to Pattern Development's consent right

Plaintiffs' third category contains five allegedly "false and misleading" statements:

9.	[At a September 4, 2019 meeting,] "the Riverstone Representatives and representatives of Party A indicated that they would not be supportive of a combination of Pattern [Energy] and Company A absent certain changes to the agreements governing the commercial relationship between Pattern [Energy] and Pattern Development." (Proxy Stmt. at 48; Compl. ¶ 145.)

---

[10] Plaintiffs cite to *Shapiro v. UJB Fin. Corp*, 964 F.2d 272, 282 (3d Cir. 1992), for the proposition that "once a defendant puts a particular subject 'in play,' the defendant is 'bound to speak truthfully' on that subject."  (D.I. 60 at 17.)  But Plaintiffs do not dispute that the statements that were made about the Party B and Party D offers were accurate.  And, contrary to Plaintiffs' apparent suggestion, *Shapiro* does not stand for the proposition that a party must disclose all material information about a subject once it discloses some information about a subject.  Rather, as explained above, to plead a Section 14(a) claim, the plaintiff must identify a statement that is rendered *misleading* in light of other facts that were not disclosed.  An omission alone, even of a material fact, is not enough.

10.   "[A] transaction involving Pattern Development was not a condition to a transaction with Pattern Energy, including the [CPPIB Merger] or a potential transaction with Company A."  (February 26 Press Release; Compl. ¶ 146.)

11.   "[T]he transaction that was being discussed with Company A did not require the consent of Pattern Development, Riverstone or Pattern Energy management" and "Pattern Development did not block any bids for Pattern Energy pursuant to any consent right."  (February 26 Press Release; Compl. ¶ 147.)

12.   "[C]ontractual arrangements with Pattern Development also limit Pattern [Energy]'s ability to merge with, or to transfer its interest in Pattern Development to, any third party without Pattern Development's consent."  (Proxy Stmt. at 36; Compl. ¶¶ 150, 153.)

13.   "The [Pattern Development Holdings] agreement was filed with the SEC in June 2017 when it was entered into and it has been an exhibit to each of the Company's Annual Reports on Form 10-K filed since that time. As a result, the terms of the arrangements with [Pattern Development Holdings] are publicly available to everyone."  (February 26 Press Release; Compl. ¶ 156.)

(D.I. 61, Ex. 3 at 4–6.)  According to Plaintiffs, the above statements are false and misleading because they misrepresent and omit "how the Consent Right was leveraged by Riverstone, the Management Defendants and Pattern Development to steer merger negotiations away from [Party A] and toward CPPIB."  (D.I. 60 at 17.)

Specifically, Plaintiffs argue that Statement 9 is "materially false" because, subsequent to September 4, Party A allegedly "assented to all of Riverstone's demands."  (*Id.* at 18.)  No.  The fact that Riverstone and Party A engaged in ongoing negotiations does not make "false" an accurate statement that the parties said what they said on a particular day.

Plaintiffs also argue that Statements 9 and 10 are misleading because they omit the fact that "Riverstone continued to refuse to give its consent even after [Party A] assented to all of Riverstone's demands" because it had a financial interest in the combined Pattern Energy/Pattern Development transaction proposed by CPPIB.  (*Id.* at 18.)  I agree with Defendants that neither statement is an actionable misleading statement, for two reasons.   First, neither makes a

representation about the facts alleged to have been omitted, expressly or by implication.  And the Proxy Statement's 18-page summary of the merger negotiations disclosed and summarized the ongoing discussions between Party A and Riverstone.  Second, the omitted "fact"—that Riverstone allegedly "continued to refuse to give its consent" to a standalone acquisition of Pattern Energy by Party A—appears to be based solely on Plaintiffs' speculation.  As the Proxy Statement disclosed, and Plaintiffs do not dispute, Party A withdrew from the negotiations before making a final proposal.[11]

Plaintiffs do not appear to dispute that Statement 11 is literally true.  Rather, they argue that Statement 11 is misleading because it omits that "the Pattern Energy Board required Party A to execute an indemnification agreement" that included "express indemnification from Party A for Pattern Energy's failure to obtain Pattern Development and Riverstone's consent to a proposed transaction."  (D.I. 61, Ex. 3 at 5.)  I disagree.  Even if the allegedly omitted fact is true, its omission does not render misleading the statements that the parties were discussing a transaction that would

_____

[11] While it is not clear from the briefing, Plaintiffs really seem to be saying that, prior to Party A's withdrawal from the negotiations, Riverstone effectively told Party A either (i) that it would not consent to a standalone acquisition of Pattern Energy or (ii) that it would not negotiate the changes to the Pattern Energy/Pattern Development agreements that Party A wanted.  (Tr. 55:6–16; Compl. ¶ 15.)  If so, the Complaint fails to allege a plausible factual basis for that assertion.  *See Iqbal*, 556 U.S. at 679 (plaintiff is required to plead facts "permit[ing] the court to infer more than the mere possibility of misconduct").  More importantly, even if either assertion (or both) were true, the omission of that information would not render misleading the Pattern Energy Board's own statement (Statement 10) that "a transaction involving Pattern Development was not a condition to a transaction with Pattern Energy, including the [CPPIB Merger] or a potential transaction with Company A."  Indeed, the February 26 Press Release indicated (and Plaintiffs do not dispute) that the Board was discussing a deal structure with Party A that would not include Riverstone's consent (Statement 11).  (February 26 Press Release ("The transaction that was being discussed with Company A did not require the consent of Pattern Development, Riverstone or Pattern Energy management.").)  Nor do Plaintiffs persuasively explain why an alleged preemptive refusal to consent by Riverstone renders misleading the statement that "Riverstone Representatives and representatives of Party A indicated that they would not be supportive of a combination of Pattern [Energy] and Company A" without certain contractual changes (Statement 9).

not include Pattern Development/Riverstone consent and that Pattern Development did not use its consent right to block any bids.

I also agree with Defendants that Plaintiffs have failed to identify a problem with Statement 12. Plaintiffs' argument is confusing but, as I understand it, they contend that Statement 12 is misleading because the statement that contractual arrangements with Pattern Development limit Pattern Energy's ability to merge is inconsistent with another statement in Pattern Energy's 2014 Form 10-K. Defendants dispute any inconsistency, but I don't need to sort that out here. The 2014 Form 10-K is not at issue here. The Proxy Statement is. And Plaintiffs do not seriously dispute that Statement 12 is a true statement.

As for Statement 13, Plaintiffs do not contend that the statement itself is false. The gist of their argument is that Pattern Energy should have provided more details about the consent right so that shareholders would not "have to parse years of SEC filings to divine the true nature of the Consent Right." (D.I. 60 at 20.) In other words, Plaintiffs wanted more information. To state a claim under Section 14(a), however, Plaintiffs are required show that the information that was not disclosed renders another statement false or misleading. Plaintiffs fail to do so with respect to Statement 13.

### 4. Statements regarding Pattern Energy management's role in the negotiations

Plaintiffs' fourth category contains the following allegedly "false and misleading" statements:

14. "At the conclusion of the June 5, 2018 strategy session our Board decided to establish the Special Committee, composed solely of independent and disinterested directors, to engage in a review of Pattern's strategic opportunities and alternatives." (Proxy Stmt. at 36–37; Compl. ¶ 161.)

15. "[T]he Special Committee, with its financial and legal advisors – not management – led the negotiation with [CPPIB] for the terms of the merger agreement" and

"[t]he Transaction is the result of a Special Committee-led process." (February 26 Press Release; Compl. ¶ 162.)

16.    "The Special Committee's instructions reiterated that Pattern management was not authorized to have any discussions regarding Pattern management's role or compensation arrangements in connection with any potential transaction without specific authorization from the Special Committee, except for limited non-compensation related discussions regarding potential key personnel, operational integration or staffing in the event a transaction were to occur." (Proxy Stmt. at 42; Compl ¶ 163.)

17.    "[T]he special committee prohibited management discussions with CPP[IB] . . . about post-closing compensation until after terms of the merger agreement had been agreed upon." (February 26 Press Release; Compl. ¶ 165.)

18.    "As a result of the Merger, the treatment of [compensatory awards for Pattern Energy's officers and directors with respect to Company Common Stock] will be as follows: [List]." (Proxy Stmt. 70–71; Compl. ¶ 166.)

(D.I. 61, Ex. 3 at 6–7.)  Plaintiffs do not really explain why they think Statements 14 through 16 are misleading beyond their assertion that "the Board Defendants concealed their failure to oversee the merger negotiations through material misstatements and omissions in the proxy." (D.I. 60 at 20–21.)  If Plaintiffs are referring to the same alleged "misstatements and omissions" they have already raised, I reject their argument for the reasons I have already stated.

To the extent Plaintiffs contend that Statements 14 through 17 are misleading because they omit that management participated in the merger negotiations and discussed post-merger employment with CPPIB prior to the merger agreement being signed, I disagree.  The allegedly omitted facts—that management participated in certain merger negotiations and participated in certain discussions regarding their potential post-merger employment, both with authorization of the Special Committee—were disclosed in the Proxy Statement.

As to Statement 18, Plaintiffs have identified nothing "false and misleading" about the Proxy Statement's disclosure of how equity awards would be handled as a result of the merger. Plaintiffs appear to believe that they are entitled to a longer explanation in support of the amounts

awarded, but Plaintiffs' desire to know information is not enough to state a claim under Section 14(a).

### 5.     Statements regarding valuation metrics

Plaintiffs' fifth category contains the following statements:

19.      "If our stockholders adopt the Merger Agreement and approve the Merger, and the Merger is completed, each share of our Class A common stock will be converted into the right to receive $26.75 in cash, without interest and less any applicable withholding taxes (unless you have properly demanded your statutory rights of appraisal with respect to the Merger), which represents a premium of approximately 14.8% relative to the unaffected closing price for shares of our Class A common stock on the Nasdaq on August 9, 2019 (the last trading day prior to the publication of market rumors regarding a potential acquisition of the Company) and a premium of approximately 15.1% over the 30-day volume weighted average price on the Nasdaq prior to that date."  (Proxy Stmt. at 1; Compl. ¶ 167.)

20.      "[Evercore's] Selected Public Company Trading Analysis."  (Proxy Statement 61–64; Compl ¶ 174.)

21.      "The effective two for one exchange ratio [proposed by Party A] was estimated, based on analysis by Evercore that was presented to the Special Committee on August 28, 2019, to reflect a range of premiums of between 1.4% and 28.8% to the unaffected closing price for a share of Company Common Stock on August 9, 2019 (the last full trading day prior to publication of the August 12, 2019 article), based on an expected range of trading prices for shares of the combined company's common stock post-transaction and on certain other assumptions."  (Proxy Stmt. at 46; Compl. ¶ 178.)

22.      "On July 31, 2019, the Special Committee met with Pattern management and representatives of Goldman Sachs to discuss preliminary financial analyses prepared by Evercore and Goldman Sachs with respect to the most recent proposals received from each of Party A, CPPIB and Party D as well as Pattern's prospects and performance as a stand-alone company."  (Proxy Stmt. at 44; Compl. ¶ 182.)

(D.I. 61, Ex. 3 at 7–9.)  Each of the challenged statements relates to financial analyses performed by Pattern Energy's financial advisors.  But Plaintiffs do not dispute that the challenged statements correctly set forth the financial advisors' analyses.  Nor do they dispute the accuracy of the calculations performed.

Instead, Plaintiffs raise a series of technical criticisms about Evercore's assumptions and calculations that amount to nothing more than an argument that Evercore should have done a different analysis.  But that does not render misleading statements that accurately describe the analysis that Evercore did do.  *Heinze*, 971 F.3d at 482–85 (affirming dismissal of Section 14(a) claim where plaintiff did not dispute that the proxy statement correctly summarized the financial advisor's calculations, reasoning that the plaintiff's request for a different analysis amounted to a non-cognizable "pure-omission theory that [was] untethered to any specific false or misleading representation in the proxy statement"); *Keryx*, 454 F. Supp. 3d at 415 (dismissing Section 14(a) claim based on alleged misleading statements regarding financial analysis where the assumptions and analysis were disclosed); *cf. Resnik*, 303 F.3d at 154 ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.").

As to Statement 22, Plaintiffs also contend that the Proxy Statement omitted "significant conflicts of interest by Goldman Sachs that incentivized it to favor a transaction that was advantageous to Riverstone."  (D.I. 60 at 21.)  But Statement 22 makes no implicit or explicit representation about Goldman Sachs's conflicts of interest.  Plaintiffs do not explain how Statement 22 is rendered misleading as a result of the omitted information, and it clearly is not.

### 6.    Statements about the shareholder vote on the merger

Plaintiffs' sixth, and final, category contains the following statements:

23.    "[U]nder applicable Canadian securities laws, the Merger is also required to be approved by a majority of votes cast by holders of [Pattern Energy] Class A common stock, other than those holders required to be excluded from such vote under such laws [pursuant to Part 8 of MI 61-101]."  (Proxy Statement at 1, 6; Compl. ¶ 192.)

24.    "As of the close of business on the record date, an aggregate of 1,210,049 votes will be required to be excluded pursuant to Part 8 of Multilateral Instrument 61-101." (Proxy Stmt. at 10; Compl. ¶ 193.)

25.    List of "Excluded Votes" pursuant to Part 8 of MI 61-101.  (Proxy Stmt. at 81; Compl. ¶ 194.)

26.    "Under the [Delaware General Corporation Law], adoption of the Merger Agreement requires the affirmative vote of the holders of a majority of the shares of [Pattern Energy] Common Stock and [Pattern Energy] Preferred Stock, voting together as a single class . . . ." (Proxy Stmt. at 1; Compl. ¶ 200.)

(D.I. 61, Ex. 3 at 9–10.)  Statements 23 through 25 relate to the number of shareholders whose shares were required to be excluded from a "majority of the minority" vote under a provision of Canadian securities law.  (*Id.* ¶¶ 192–95.)  Plaintiffs allege that Public Sector Pension Investment Board ("PSP"), Pattern Energy's largest shareholder at the time of the merger, had significant co-investments with Pattern Energy.  (*Id.* ¶ 188.)  Plaintiffs contend that the Proxy Statement's failure to disclose PSP's interest, and to include PSP on the list of shareholders whose shares were required to be excluded, renders the challenged statements misleading.

Plaintiffs' argument is predicated on a conclusion about what Canadian law requires that Plaintiffs did not even mention, let alone explain, in their brief.  Moreover, while I do not doubt that a single act taken by a company could violate the laws of more than one nation, I decline Plaintiffs' invitation to hold that Section 14(a) can be violated where a company makes an undisputedly truthful statement about how it plans to conduct a vote in accordance with its interpretation of Canadian law.  Plaintiffs do not dispute that Statements 23 through 25 accurately explain how Pattern Energy intended to conduct the voting process.  Plaintiffs may dispute what Canadian law requires, but that does not make misleading Pattern Energy's statement of what its own interpretation was and what it planned to do.  If Plaintiffs think Canadian law was violated, they can seek whatever remedies (if any) they have under that law.

Statement 26 states the majority vote requirement for approval of a merger under Delaware General Corporation Law.  (Compl. ¶ 200.)  There is nothing false or misleading about it.  If

Plaintiffs think Defendants violated the Delaware General Corporation Law, they can seek whatever remedies are available to them under that law.[12]

\* \* \*

It is clear from Plaintiffs' allegations that they believe that wrongdoing occurred in connection with the merger. They may or may not be right. But a breach of fiduciary duty unaccompanied by a false or misleading statement does not violate the federal securities laws. *Laborers' Local #231 Pension Fund v. Cowan*, 300 F. Supp. 3d 597, 604 (D. Del. 2018). To state a Section 14(a) claim, Plaintiffs were required to identify a particular statement that was false or misleading. They failed to do so. I therefore recommend that the Court dismiss Plaintiffs' Section 14(a) claim (Count I).[13]

---

[12] Plaintiffs cite *Gould v. American-Hawaiian S.S. Co. (Gould II)*, 535 F.2d 761, 772 (3d Cir. 1976), but the challenged misstatements in that case were express representations in a proxy about the number of shareholders that had "agreed" to vote for a merger. Not so here.

[13] Because Plaintiffs have failed to point to a false or misleading statement in the Proxy, the Court does not need to address their claim that Pattern Development is liable under Section 14(a). That said, the Complaint fails to plausibly allege that Pattern Development "solicit[ed]" or "permit[ted] the use of [its] name to solicit" proxies within the meaning of Section 14(a). 15 U.S.C. § 78n(a)(1). To find liability under Section 14(a), courts require at least "a substantial connection between the use of the person's name and the solicitation effort." *In re Bank of Am. Corp. Sec., Deriv., and ERISA Litig.*, 757 F. Supp. 2d 260, 294 (S.D.N.Y. 2010) (quoting *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C. Cir. 1980)). Such a connection may exist where, for example, a director up for election allows the company to solicit proxies in her name, *see Chris-Craft Indus., Inc. v. Independent Stockholders Comm.*, 354 F. Supp. 895, 915 (D. Del. 1973), or where the party that will gain control through a transaction reviewed the proxy and allowed the use of his name, which carried the weight of his "reputation as a businessman" and his "plans for [the company]." *Falstaff Brewing Corp.*, 629 F.2d at 69. In short, a Section 14(a) plaintiff must plead some facts plausibly suggesting that a defendant either itself participated in the solicitation effort or, at a minimum, "put [its] reputation[] in issue" by supporting the proxy. *Chris-Craft Indus*, 354 F. Supp. at 915. The Complaint here contains no such facts with respect to Pattern Development. And, having conducted a detailed review of the Proxy Statement itself, I am at a loss as to why any shareholder reading that document would think either that Pattern Development was soliciting proxies or that its name was being used to solicit proxies.

**B.      Section 20(a) Claim**

Section 20(a) imposes liability on controlling persons for underlying violations of the Exchange Act by controlled persons.  To plead a Section 20(a) claim, Plaintiffs were required to allege an underlying Exchange Act claim.  Because Plaintiffs' Section 20(a) claim (Count II) is predicated on their Section 14(a) claim, it should likewise be dismissed.

**C.      State-Law Claims**

Plaintiffs assert that the Court has supplemental jurisdiction over their state-law claims pursuant to 28 U.S.C. § 1367.  (Compl. ¶ 23; D.I. 60 at 31–32.)  However, under 28 U.S.C. § 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction" over state-law claims if it "has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3). And "[i]t '*must* decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original)).

Plaintiffs have not provided an affirmative justification for this Court to exercise supplemental jurisdiction over their state-law claims.  (D.I. 60 at 31–32.)  And I agree with Defendants that considerations of judicial economy, convenience, and fairness to the parties actually support declining jurisdiction because a consolidated action alleging nearly-identical breach of fiduciary duty and aiding and abetting claims is already pending in the Delaware Court of Chancery.  *See In re Pattern Energy Grp. Inc. Stockholders Litig.*, No. 2020-357-MTZ (Del. Ch.).  Accordingly, I recommend that the Court dismiss the state-law claims (Counts III and IV).

## IV.    CONCLUSION

For the foregoing reasons, I recommend that the Section 14(a) claim alleged in Count I and the Section 20(a) claim alleged in Count II be dismissed.  I also recommend that the Court decline to exercise jurisdiction over the state-law claims alleged in Counts III and IV.  Accordingly, I recommend that Defendants' Motions to Dismiss (D.I. 48, 50) be GRANTED.  I further recommend that Plaintiffs be granted leave to amend their complaint within thirty days.[14]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1.  Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.

Dated:  January 28, 2021

_____
The Honorable Jennifer L. Hall
UNITED STATES MAGISTRATE JUDGE

---

[14] At the hearing, Defendants opposed any opportunity to amend (Tr. 68:12–69:11), but it is not clear from this limited record that amendment would be futile or inequitable.  *See Alston v. Parker*, 363 F.3d 229, 235–36 (3d Cir. 2004) (holding that leave to amend should be granted "unless a curative amendment would be inequitable, futile, or untimely").